## Court of Appeals.

May 30, 1905.

# THE PEOPLE v. CHARLES JACKSON.

(182 N. Y. 66.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of an indictment for murder, committed in an assault upon the deceased for the purpose of robbery, examined and held sufficient to sustain a verdict convicting the defendant of the crime of murder in the first degree.

2. IDENTIFICATION.

Evidence identifying the defendant as the assailant of the deceased, alleged to be untrustworthy, considered and its weight held to be a question for the jury.

3. EVIDENCE—EFFECT OF UNEXPLAINED POSSESSION OF PROPERTY OF DE-
CEASED THE MORNING AFTER THE ATTACK.

Where the defendant attempted to account for his possession of the watch and pocket book of the deceased, the morning after the assault, by improbable and conflicting statements, some of which were proved to be false, the jury are justified in discrediting all of his testimony and in finding him guilty of the crime charged in the indictment, since possession of the fruits of crime, recently after its commission, is *prima facie* evidence of guilty possession, and if unexplained must be taken as conclusive.

4. PROOF AS TO BLOOD STAINS.

Where it appears that the deceased bled profusely, the fact that the defendant's clothes put in evidence bore no trace of blood does not create a presumption that he did not commit the assault; especially in a case where the stains would not necessarily result and, if they did, he had abundant opportunity before his arrest to remove them.

5. WHEN EXCLUSION OF EVIDENCE TENDING TO PROVE A NEGATIVE ONLY IS
NOT ERRONEOUS.

Where a witness for defendant was asked, " Did he (the defendant) say anything to you about money; that he was hard up or wanted money, or wanted to borrow money, or must have money that night? " (the night of the murder), it is not error to exclude the answer thereto since the evidence called for was negative in its character and would not have proved that the defendant was not under pressing money needs that night, and hence that no such motive existed for his committing the crime charged.

6. WHEN IT IS NOT ERROR TO REFUSE TO DIRECT THE PROSECUTION TO PRO-
DUCE ALLEGED EX PARTE STATEMENTS OF WITNESSES TAKEN BY
CORONER.

Where defendant's counsel had a copy of the minutes of the testi-
mony taken at the coroner's inquest and there was no evidence that any
*ex parte* statements had been taken by the coroner, or that the dis-
trict attorney's office was in possession of any such statements, and the
trial court refused to direct the district attorney to allow defendant's
counsel to inspect such statements and make copies of them, but sug-
gested that a subpœna *duces tecum* be issued to the district attorney
to produce such statements, if any existed, such ruling is not erroneous.

7. GOOD CHARACTER—WHEN CORRECT CHARGE AS TO EFFECT OF EVIDENCE
OF GOOD CHARACTER NOT AFFECTED BY QUALIFYING STATEMENT.

It is not error in charging, as requested by defendant, "That evi-
dence of good character may of itself create a reasonable doubt where
otherwise no reasonable doubt would exist," to add, "And, in relation
to that, you can give such testimony that consideration that you think
it is entitled to and no more, taking it into consideration with all the
other facts and circumstances of the case;" since the charge made was
within the settled rule, and the qualification that followed neither
added to nor took from the proper rule as stated.

APPEAL from a judgment of the Court of General Sessions
of the Peace in the county of New York, rendered Septem-
ber 1, 1903, upon a verdict convicting the defendant of the
crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Hal Bell and Phil Waldheimer for appellant.

The evidence does not demonstrate the fact of the killing of
the deceased by the defendant beyond a reasonable doubt and,
therefore, justice requires that a new trial should be granted.
(People v. Carbone, 156 N. Y. 413; Code Crim. Pro. § 528.)
Where the proof of the identification of the defendant is not
ample and satisfactory with respect to the *corpus delicti,* the
question of motive becomes very important. (People v.
Zachello, 168 N. Y. 35; People v. Ferraro, 161 id. 365.)
The ruling of the court in excluding testimony to prove that

the motive charged against the defendant did not in fact exist presents prejudicial error.    (People v. Smith, 172 N. Y. 210.)

William Travers Jerome, District Attorney (Howard S. Gans of counsel), for respondent.

The evidence established the defendants guilt beyond a reasonable doubt, and the jury's conclusions should not be disturbed.    (Greenl. on Ev. [16th ed.] ·129, § 34; Knickerbocker v. People, 43 N. Y. 177; People v. Weldon, 111 id. 571; People v. Wilson, 151 id. 403; People v. Schmidt, 168 id. 575; People v. Kennedy, 165 id. 454.)    The points made as to the rulings on the trial are clearly frivolous.    (Kane v. Larkin, 131 N. Y. 311; Romertze v. Bank, 49 id. 577; Gaffney v. People, 50 id. 417.)

BARTLETT, J.: The indictment is in the common-law form, containing three counts, and in substance charges that the defendant, on the 10th day of July, 1903, did wilfully feloniously and of his malice aforethought, beat, strike and wound one Charles W. Roxbury with a club or some instrument unknown, upon his head, causing divers mortal wounds and fractures, from which he died on the 11th day of July, 1903. A jury convicted the defendant, a colored man, of murder in the first degree, and we are now called upon to review the record of the trial.

The evidence of the People discloses a case of highway robberry, in which the assailant inflicted upon the deceased fatal wounds, causing his death in about four hours after the assault. The murder was committed between half-past eight and nine o'clock on Friday evening, July 10th, 1903, the victim dying at about one o'clock the next morning. The deceased is described as a middle-aged man, rather slight, and at the time of the assault in good health.

The scene of the tragedy was on River avenue, in the borough of the Bronx, city of New York, at a point where 166th street, as shown on the city map, intersects it, but at the time of this occurrence was not opened through. The locality is described as lonely, imperfectly lighted, and, to a great extent, unimproved. On the evening in question the deceased, accompanied by a young woman, Miss Thomasch, left the elevated train at McComb's Dam bridge, the new Central bridge, walked across it and down the steps from the bridge into 161st street and through that street to Gerard avenue; then through Gerard avenue to 165th street and thence to River avenue. Miss Thomasch was the only witness of this assault and was sworn on the trial by the People. She thus testified upon her direct examination: " Then we walked north on River avenue, on the west side of the avenue. Mr. Roxbury was on my left and I was on the right; Mr. Roxbury was on the inside and I was on the outside, or the curbstone of the street—Mr. Roxbury near the fence and I nearer the curb. There were no people on River avenue at that time. As the street was deserted, we turned to go south on River avenue, and we saw a man and woman walking north about a block away; and when Mr. Roxbury and I saw this man and woman coming toward us, we turned around and walked north again on River avenue. There were no lights on River avenue; it was a bright night. River avenue is about a block away eastwardly from Jerome avenue. The country about there is open; there are electric lights on Jerome avenue. As we proceeded north on River avenue as I have stated, Mr. Roxbury was on my left side and I was on the curb side, a man came from behind me, struck me on my right arm, faced me with a club in his hand, and went to strike Mr. Roxbury. Mr. Roxbury fell back. I saw the man and see him now; he is sitting in front of me (indicating the defendant). . . . When this man came from behind, around in front of me, hitting my right arm, and with a club raised

going to strike Mr. Roxbury as I have stated, I ran for assistance north on River avenue to 167th street, and found two men that I didn't then know. I spoke to them; they left me sitting on the stoop and they went down on River avenue; they came back, and I had a further conversation with them, and then went with the two men down on River avenue to the place of assault. . . . When we reached this spot one of the men put his hand on the fence; he showed me his hand, and it was red and the fence was wet with blood. The other man struck a match. We could not find Mr. Roxbury, and we turned and they brought me back to Jerome avenue. They put me on a car. . . . I went home. The assault took place between half-past eight and nine o'clock. . . . What I have described as a club in the hands of the assailant, I merely noticed as a club; one that might be a policeman's club—about the thickness and length, it appeared to be a wooden club and of dark color; it was a foot and a half long, or about two feet." The witness testified that she proceeded toward the east side of the city where she resided with her mother, and had no knowledge of what occurred subsequently during the night.

It was proved that the deceased walked over a mile to his residence, No. 1817 Crane place, in the Bronx, notwithstanding a profuse hemorrhage which left drops of blood from the place of the assault to the steps of his house. The surgeon who conducted the autopsy testified that the skull on the left side was "fractured in so many different directions that one of the pieces of bone could be lifted right out." On his arrival home the deceased was placed in bed, soon became unconscious, was attended by two physicians, and died about one o'clock the next morning without regaining consciousness. So far as this record discloses he gave no account of the manner in which he received his injuries.

Miss Thomasch was cross-examined at great length and admitted that at the time of the assault she did not know whether

the assailant was white or colored, and that she had but a "passing glance," as the incident was very brief. She also testified that the assailant's hat was drawn down nearly to his eyes, and that the collar of his coat was turned up around his throat and only a portion of his face was visible. She further testified that it was the man's build, his general appearance, his soft hat and his expressive eyes that led her to subsequently identify him. She also swore that it was a bright night and one could see distinctly, and that the moon was rising. As to the place of the assault she said that it was deserted, but not particularly dark.

The learned recorder, who tried this case with great fairness, seeking to guard the defendant's rights in every way, cross-examined Miss Thomasch at considerable length, confining his inquiries as to the accuracy of her identification of the defendant at the time of the assault. In the course of this inquiry she added to her original statement that she heard the assailant utter the word "you" as he approached the deceased. The court impressed upon the witness, again and again, that she stood in a position of terrible responsibility, and that her answers were likely to be matter of life and death to the defendant, and asked her if she was perfectly certain of his identity. On each occasion she said, in substance, that she clearly identified the defendant. The court then asked this question: "Q. Is there anything about this whole matter, Miss Thomasch, that you have failed to state, anything now known to you, on your conscience, under the obligation of your oath, that you have failed to state to the jury? A. Nothing. Q. Have you stated every atom of knowledge in your possession? A. Everything, yes." The learned judge closed his examination with this question: "Q. Now, if you have any lurking doubt in your mind as to the defendant being the man, I want you to state it now? A. My conscience is perfectly clear, and I feel I am not doing the man an injustice."

The defendant was arrested on the 17th of July, one week after the assault, at his residence, No. 538 West 50th street. He was then taken to the Tremont police station, where it was arranged that Miss Thomasch should be brought into a room where the defendant was standing with other men and ascertain if it was possible for her to identify him. Miss Thomasch thus states: The next time I saw the defendant after the assault was at the Tremont police station. There were eight men—four white and four colored men. I was brought into the room where they were and picked out this defendant and identified him as the man that I saw attack Mr. Roxbury. I picked him out from among eight men—four white and four colored. I had not seen any picture of the defendant prior to that, or heard any description of him." The police officials confirmed this statement on the stand.

The case of the People rests not only upon the evidence of Miss Thomasch, relating to the time of the assault and her subsequent identification of the defendant, but upon the fact, conceded at the trial, that the defendant was in possession of the watch and pocketbook of the deceased the morning after the murder. The defendant, while admitting this fact, sought to explain it, he having been sworn as a witness for the defense.

At this point it leads to a more orderly development of the facts to refer to the testimony of Lucy Mitchell, the mistress of the defendant, with whom he was living on the 10th day of July, 1903. She testified that the defendant had been in the city for some three days prior to July 10th, 1903; that he told her that he had been in Buffalo; that he had been taking care of horses out there. She stated that he left his house at about half-past five on the afternoon of July 10th and did not return until about a quarter to ten that night. She also testified to a conversation she had with the defendant that day in regard to money matters; that she informed him they owed the landlord for rent; also on furniture bought on the install-

ment plan, and claims for clothes purchased for him and herself, and some other matters; that she cried over the matter and in substance expressed her dissatisfaction; that he told her he would try and borrow the money. Referring to the defendant's return the night of the murder at about a quarter to ten, she said that she admitted him to the house; that the light in the room was very dim and she neither spoke to him nor touched him, but went to bed; that she arose between nine and ten the next morning, and when she came out into the front room after dressing she found the defendant there, and that he showed her a watch; that she asked him where he obtained it, and he said that he found it; that it was gold; that he was going down to pawn it, and that she told him that he had better not do it, as there might be a reward for it. She identified the watch of the deceased in evidence as the watch then produced by the defendant. The witness further testified that defendant went out about half-past ten and returned an hour later, and showed her the pawn ticket and gave her eleven dollars, two five dollar bills and one dollar. This witness was then shown the pocketbook of the deceased, and was asked when she first saw it, and she said it was on Monday or Tuesday of July following the 11th; that defendant came to the house and took it out of his pocket and showed it to her; said that he had found it; that she looked at it and handed it back to him, and he then threw it on the bureau. One of the detective sergeants testified that he found the watch at a certain pawn shop, where defendant admits that he had pawned it, and on going to defendant's house he found the pocketbook in a bureau drawer with the pawn ticket.

The defendant took the stand in his own behalf and denied that he committed the assault, and professed to account for his movements during the entire evening of July 10th; he is, however, corroborated by no witness covering the time of the assault. He also undertook to explain his possession of the

watch and pocketbook.  He stated that on the morning of
July 11th he left his house at about eleven o'clock, went out
and met a white man, whose nickname was " Slim," at the
corner of Fiftieth street and Tenth avenue; that " Slim " pulled
out the watch in question and asked him if he wanted to buy it;
he told him that he hadn't any money, and finally " Slim "
asked him to pawn it, and he consented after some talk, " Slim "
agreeing to give him half of the amount advanced upon the
watch; that he took the watch, went home, stayed around there
a little while, and then he went out and pawned it at a shop
where he was acquainted, and received an advance of fifteen
dollars upon it; that he returned to the corner of Tenth avenue
and Fiftieth street and found " Slim " still waiting for him,
and they there divided the money, but as " Slim " was unable
to make change he gave the defendant ten dollars, retaining
five as his share of the loan; that he took out his purse, and
he had bills in it, and he put the five dollar bill around them,
and he put them into his pocket and asked him if he did not
want the purse and he accepted it.  It is conceded that this
purse was the pocketbook of the deceased and one of the
People's exhibits.

The defendant swore on his redirect-examination that he
worked with " Slim " in Fleetwood park for Rogers & Sons;
that he and " Slim " were team drivers and he worked there
a considerable time; that the name of the foreman under whom
they worked was Grinnon; also that he knew a colored man
who worked there named John Cross; he also was a team
driver.  A juror asked the defendant how " Slim " came by the
watch and he replied that he did not know.

The People in rebuttal recalled George F. Titus, a police
inspector, who testified as follows: " This pocketbook I ex-
hibited to the defendant and asked him if he had seen it before
and he said he had; that he had found it several weeks pre-
vious—five or six weeks is the language used—in a Tenth

avenue car with two dollars in it. He made that statement to me on the morning of July 18th." Edward Kaskel was also sworn and testified that he was the pawnbroker's manager at the place where this watch was pawned and that the defendant gave his address as 416 West 36th street. It will be observed that this was a false address.

Robert Charlton, a detective sergeant, was recalled and testified that he asked the defendant on the night of July 17th, when he was arrested, where he was on Friday and Friday night, July 10th, and he replied that he was at home all day and all the evening except when he went out for a pint of beer.

At this point the learned recorder suggested that an adjournment, as moved by counsel, might be proper in the interests of the defendant to enable witnesses to be summoned who might confirm the defendant's statements as to acquaintanceship with the man known as " Slim " several years before and as to his meeting with him on the occasion when he claims he received from him the watch and pocketbook. Thereupon an adjournment was taken, the court instructing the police officials to render all the assistance in their power in serving subpœnas and reaching these witnesses. At the reassembling of the court after this adjournment the defendant's counsel announced that the defense rested. The district attorney expressed surprise and said that they had served several subpœnas and witnesses were now present in court. The defendant's counsel insisted that the People ought to put them on the stand and give him the right of cross-examination. The district attorney objected, but the court directed he should proceed in that manner. The court also ordered, on motion, that as to these witnesses when one was testifying the others should be excluded from the court room.

It will be recalled that the defendant when testifying had stated that he worked for some time with the firm of Rogers & Sons, and that William Grinnon was superintendent. William

Grinnon was produced as a witness and testified that he had worked for Rogers & Sons for ten years, and that the defendant did work for that firm about three or five years ago; that he did not remember how long he remained with them. He also testified that three or four years ago there was a person working there who was known by the name of " Slim;" that he could not say whether " Slim " was there when the defendant was or not; that he thought he could recognize " Slim " if he saw him. The district attorney then asked these questions: " Q. Do you see this man now standing at the bar? A. That's the man. Q. And that is the person that you described as ' Slim?' A. Yes, sir. Q. And he was working for J. C. Rogers & Sons three or four years ago? A. Yes, sir. Q. You are sure of that? A. Yes, sir."

A colored man named John Cross was placed on the stand and testified that he was a driver for Rogers & Sons; that he knew the defendant, and that he worked for that firm about three years ago, he supposed. He also testified that there was a man who was known as " Slim " there, who worked there about four years, to the best of his knowledge; that he could not say that defendant and " Slim " were working for Rogers & Sons at the same time; that he did not think he could recognize " Slim " if he saw him. He also stated that there never was in his time but one man known as " Slim " who worked for that firm.

Harvey Thompson was then sworn and testified that he formerly worked for the firm of Rogers & Sons; drove a team; that he knew William Grinnon, who was the stable boss; that he worked for Rogers & Sons three or four years; that he knew a colored man named John Cross, who worked for the firm; that he never saw the defendant; that on the 10th day of July, 1903, he was at Croton dam and was not in the city of New York on the 11th day of July, 1903. He testified that he went by the nickname of " Slim " when working for Rogers & Sons,

and also before that time on other works, and since that time when working at Croton dam; that he had always been known by that name ever since he was on the public works; that there was no other man known by the name of "Slim" who worked for Rogers & Sons; that he did not know the defendant, and did not recall of ever having seen him; that he did not know a saloon on Eleventh avenue known as the "Shamrock," and never was in a saloon known as the "Shamrock."

The defendant had testified that he called once with "Slim" on his sister-in-law, Lizzie Jackson. She was sworn and testified that the defendant had never called on her with a man named "Slim," and that she had not seen the defendant for three years.

It thus becomes clear that the defendant failed to account for his possession of the watch and pocketbook, and it is evident that he used the name of "Slim," recalling it possibly as a person he had met years before at the works of Rogers & Sons; it is equally clear that he had no interview with "Slim" as he testified, at least the jury were justified in taking this view of the evidence in reaching the conclusion that the entire story was fictitious.

The failure of the defendant to account for the possession of the watch and pocketbook is further shown by the conflicting statements made by him to the officers of the law after his arrest. Robert Charlton, a detective sergeant, testified that the second day after the murder he went to the house of the defendant and found the pawn ticket for the watch and secured the pocketbook, and afterwards obtained the watch. James McCafferty, a detective sergeant, testified that he was with Charlton when the arrest was made on the 17th of July, and that he asked the defendant where he obtained the watch that he pawned on the 11th day of July, and he said he found it in Danbury, Connecticut, under a seat in Barnum & Bailey's

show, where he was working. This witness swears that he heard the defendant tell, when in the presence of inspectors Titus and McCluskey, that he found it at Bridgeport, in Barnum and Bailey's show. The defendant later corrected this statement and said that it was Danbury. We have in addition the statement the defendant made to Inspector Titus, to which reference has already been made, that instead of obtaining the pocketbook from "Slim," as he testified on the trial, he found it five or six weeks before the murder in a Tenth avenue car with two dollars in it.

It seems useless to investigate further the network of falsehood in which this defendant entangled himself, creating a situation that undoubtedly led the jury to discredit his entire statement. This being so, the defendant is in the attitude of one having failed to explain the possession of the watch and pocketbook of the deceased the morning after the murder.

In Greenleaf on Evidence (Vol. 1 [16th ed.], p. 129) the rule of law governing this situation is thus stated: "But possession of the fruits of crime recently after its commission is *prima facie* evidence of guilty possession, and, if unexplained either by direct evidence or by the attending circumstances, or by the character and habits of life of the possessor, or otherwise, it is taken as conclusive. This rule of presumption is not confined to the case of theft, but is applied to all cases of crime, even the highest and most penal. Thus, upon an indictment for arson, proof that property, which was in the house at the time it was burnt, was soon afterwards found in the possession of the prisoner, was held to raise a probable presumption that he was present, and concerned in the offense. The like presumption is raised in the case of murder, accompanied by robbery; and in the case of the possession of an unusual quantity of counterfeit money."

In Knickerbocker v. People (43 N. Y. 177) it was held: "The proof of exclusive possession by the prisoner, recently

after the theft, of the whole or some part of the stolen property, is sufficient when standing alone, to throw upon him the burden of showing how he came by it; and if he fails to do so, warrants the jury in convicting him of larceny. And if the property was shown to have been taken by burglary or robbery, such possession, unexplained, is sufficient also to warrant a conviction of those crimes."

In Wills on Circumstantial Evidence (6th Am. ed. [1881] p. 53) the rule is thus stated: " Since the desire of dishonest gain is the impelling motive to theft and robbery, it naturally follows that the possession of the fruits of crime recently after it has been committed, affords a strong and reasonable ground for the presumption that the party in whose possession they are found was the real offender, unless he can account for such possession in some way consistent with his innocence. . . . But if the account given be unreasonable or improbable on the face of it, or if the party has given different accounts of the same transaction, then he will not be relieved from the pressure of the general rule of presumption. (See, also, Rickman's Case, 2 East's Pleas of the Crown, 1034, 1035; Commonwealth v. Talbot, 84 Mass. [2 Allen] 161, 163; Roscoe's Criminal Evidence [2d ed.], 453.)

In Wilson v. United States (162 U. S. 613, 619, 620) the court, after recognizing the above rule, states: " Proof that defendant had in his possession, soon after, articles apparently taken from the deceased at the time of the death is always admissible, and the fact, with its legitimate inference, is to be considered by the jury along with the other facts in the case in arriving at their verdict. (Williams v. Commonwealth, 29 Penn. St. 102; Commonwealth v. McGorty, 114 Mass. 299; Sahlinger v. The People, 102 Ill. 241; State v. Raymond, 46 Conn. 345; Wharton's Criminal Evidence, § 762.)"

The learned counsel for the defendant presented his case at the bar with great earnestness, and we will now consider the

points he urges upon our attention as calling for the reversal of the judgment. It is argued that the identification of the defendant as the assailant of the deceased by Miss Thomasch " is incontrovertibly and thoroughly unsatisfactory and untrustworthy." It was clearly a case for the jury as to the weight that should be given the evidence of this witness relating to the assault, and we see no reason to interfere with the verdict in this connection. As to the identification of defendant by the witness at the police station, it seems to have been made under conditions that were entirely fair to the defendant, and must have carried conviction to the minds of the jury that the witness was truthful when she stated on cross-examination that " it was the man's build, his general appearance, his soft hat and his expressive eyes that led to her recognition of him."

The defendant's counsel points out that Miss Thomasch testified that immediately before the assault she saw following herself and the deceased to the south of them a man in the company of a woman; she further testified that the assailant came from behind in making his attack. From these facts it is argued that the conclusion from her testimony is irresistible that the assault was committed by that man with that woman. As we read the record it is barren of any evidence showing from whence the assailant came save that he approached the witness from behind. The jury were bound to deal with the situation according to the proofs before them. It was proved that the man and woman following the deceased and his companion were about two hundred feet distant.

It is argued that the articles belonging to the deceased might have come into defendant's possession in a number of different ways, in addition to the one he stated, that would not in anywise have connected him with the assault. This suggestion hardly seems deserving of serious consideration.

Defendant's counsel also urges that as the deceased bled profusely, any one robbing his person, as the defendant is

charged with doing, must have had his clothes besmeared with blood.  He also points out that all the defendant's clothes that he had on at the time of his arrest and that he wore on the night of the assault, were put in evidence by the defense, but no blood was found upon them, nor was any such proof of blood offered by the district attorney.  It is a mere assumption that if defendant took from the deceased his watch and pocketbook, his clothes would necessarily be besmeared with blood.  It is in evidence that the deceased, notwithstanding his fatal injuries, was able to walk from the place of the assault to his home, a distance of more than a mile, and it is quite reasonable that on demand by his assailant the deceased may have handed his watch and pocketbook to him.  A futher answer to the position of counsel is that the defendant was not arrested until a week after the assault, and abundant opportunity was afforded him in this interval to have removed blood stains, if any existed.

In point VIII of defendant's brief it is stated that the court erred in excluding proof that the defendant was not under pressing money needs that night, and, hence, that no such motive existed for his committing the deed as the prosecution sought to show.  The ruling complained of arose when defendant's witness, William Smith, was on the stand.  Smith had testified that he knew the defendant and had known him for about eight months; that he lived within a block of him; that on the evening of the murder he saw the defendant at his (Smith's) house between seven o'clock and five minutes past seven.  He was asked this question: " Q.  Did he say anything to you about money, that he was hard up, or wanted money, or wanted to borrow money, or must get any money that night?"  The question was objected to and excluded.  The evidence called for was negative in its character and its exclusion not prejudicial.  It would have in no way affected the defendant's case with the jury if the witness had been allowed to answer this question in the negative; nor would it

have proved that the defendant was not under pressing money needs that night, and, hence, that no such motive existed for his committing the deed as claimed by counsel.

In point IX of defendant's brief it is urged that the trial judge erred in refusing to direct the district attorney to give to counsel for defendant for examination and for the purpose of making copies for use upon the trial the sworn statements of witnesses made before the coroner. At the opening of the trial the defendant made a motion to direct the district attorney to permit him to inspect sworn statements of certain witnesses, not naming them, that were taken by the coroner, and to hold them long enough to make copies for use in the trial, the district attorney having refused, upon demand, to grant permission to do so. In discussing this motion defendant's counsel admitted that he was in possession of the copy of the testimony that was produced before the coroner in the Coroner's Court, but that he understood that certain sworn statements of witnesses, not naming them, were taken by the coroner, which he claimed the right to inspect. The district attorney replied that so far as he knew the counsel for the defense had all available papers that were proper for him to receive, being the minutes that were taken before the coroner in the Coroner's Court. He also intimated that if the district attorney had the *ex parte* statements referred to he was perfectly willing the defendant's counsel should see them. The court ruled, after some discussion between counsel, as follows: " I do not see that it is within my power to make an order as to things I have no judicial knowledge of. I suggest that a subpœna *duces tecum* to the district attorney to produce the papers, perhaps, would be a proper remedy." A proper disposition was made of this motion. There was no direct evidence that any *ex parte* statements were taken before the coroner of witnesses whose names were disclosed, nor does it appear that the district attorney's office was in possession of any such state-

ments, or that the defendant's counsel had made any effort to subpœna the same *duces tecum*.

The defendant's counsel requested the court to charge (seventeenth request) as follows: "That evidence of good character may, of itself, create a reasonable doubt, where otherwise no reasonable doubt would exist. The Court: I so charge. And, in relation to that, you can give such testimony that consideration that you think it is entitled to, and no more, taking it into consideration with all the other facts and circumstances of the case." Counsel argues that, while the court charged as requested, the qualification following was error, citing People v. Bonier (179 N. Y. 315; 18 N. Y. Crim. 516). The charge as requested and made was within the rule laid down in the case cited, and the qualification that followed neither added to nor took from the proper rule as stated to the jury.

The remaining exceptions may be considered together. The officers who arrested the defendant were sworn by the People, and under cross-examination were asked if the defendant made any offer to escape or manifested nervousness. This evidence was ruled out. The pawnbroker's representative, when on the stand, was asked this question: "Q. At no time has there been any question of any crime connected with any article that defendant ever pawned at your shop?" The objection to this question was sustained. These rulings obviously presented no legal error.

A careful examination of this record satisfies us that nowithstanding the fact that the guilt of the defendant rests in part upon circumstantial evidence, the jury rendered the only verdict possible under the circumstances.

The question of deliberation and premeditation does not enter into this case, as the defendant was engaged in the commission of a felony at the time he inflicted the fatal wounds upon the deceased, his offense thus falling under the statute

which defines murder in the first degree to be the killing of a human being " without a design to effect death by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed, or otherwise." The evidence is uncontradicted that the deceased was waylaid, assaulted fatally, and robbed on a public highway.

The judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, O'BRIEN, HAIGHT, VANN and WERNER, JJ., concur.

Judgment of conviction affirmed.