## WILSON v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 884. Submitted April 13, 1896. — Decided April 27, 1896.

Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight, unless explained by the circumstances, or accounted for in some way consistent with innocence.

The existence of blood stains at or near a place where violence has been inflicted is relevant and admissible. in evidence, and, if not satisfactorily explained, may be regarded by the jury as a circumstance in determining whether or not a murder has been committed.

The testimony of the defendant in a criminal case is to be considered and weighed by the jury, taking all the evidence into consideration, and such weight is to be given to it as in their judgment it ought to have.

In the trial of a person accused of murder, the picture of the murdered man is admissible in evidence, on the question of identity, if for no other reason.

The true test of the admissibility in evidence of the confession of a person on trial for the commission of a crime is that it was made freely, voluntarily and without compulsion or inducement, and this rule applies to preliminary examinations before a magistrate of persons accused of crime.

When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject it if, upon the whole evidence, they are satisfied that it was not the voluntary act of the defendant.

WILSON was convicted of the murder of one Thatch, both being white men and not Indians, on May 15, 1895, at the Creek Nation in the Indian country, and sentenced to be

hanged. There was evidence tending to show that Thatch's body was found in a creek near where Wilson and Thatch had camped together two weeks before, in a state of decomposition indicating that deceased had been dead for that length of time. Wilson was arrested the day the body was discovered, and had in his possession five horses and a colt, a wagon, gun, bed clothing and other property that had belonged to Thatch. When Thatch left home he had no money except some thirty dollars in cash and a certificate of deposit for one hundred and forty dollars, issued by the bank of Springdale, Arkansas. Wilson, when taken, had about twenty-eight dollars, and the certificate of deposit was found among Thatch's things in a trunk claimed by Wilson. All of Thatch's clothing was in the possession of Wilson, except a pair of overalls, and the body had on a pair of overalls similar to Thatch's. The bed clothing was bloody and the blood had passed through the bed, the bloody parts being a foot or more in diameter; a pillow case belonging to Thatch was sewed over the blood spots on one side of the bed tick and a flour sack sewed over those on the other; charred pieces of cloth and some buttons were found at the camping place, and some blood in the ground under where there had been fire.

Wilson claimed that Thatch was his uncle, but Thatch's relatives knew of no such relationship; also, that he had known Thatch for several years, but the evidence tended to show that Thatch had never known Wilson before he was brought to his camp by a boy who had started with Thatch from Springdale, Arkansas, but concluded to return, and was requested to find some one else to go in his place.

On the day before that on which he was alleged to have been killed, Thatch and Wilson were seen camping at dark near the creek, and that night about ten o'clock two gun shots were heard in that direction, but the body was so badly decomposed that it could not be told whether any bullets had entered it. The head was crushed with some blunt instrument, and there was testimony that an axe found in Wilson's possession had blood on it. Wilson was seen at the camp the next morning at sunrise, but Thatch was not there. Wilson

said that Thatch had left about two weeks before the discovery of the body, and that he had heard nothing from him since; told contradictory stories as to where Thatch had gone; asserted that Thatch owed him and the indebtedness was liquidated by his purchasing the wagon and two of the horses; that he bought the clothing after the time he said Thatch had left; that the pillow case was sewed on the bed tick when he bought it; that Thatch rode away on horseback, though Thatch's saddle was there, the only pair of shoes that Thatch had was there, the plates had been taken from the heels of the shoes, and similar plates were found in Wilson's possession. The body had on no shoes, hat or coat, only an undershirt, overalls and a pair of socks. Tracks resembling Wilson's near where the body was found were testified to. Wilson admitted that he had been there, and then said that it was lower down the creek. One witness, after Wilson was put in jail, assured him that he would go and look for Thatch if necessary, and Wilson told him not to go, as it was not necessary. His explanations of the appearances against him, on the stand and otherwise, were inadequate and improbable, and evidence in much detail showed that many of his statements were false.

Wilson called witnesses to show that the blood found on the bed clothes had gotten there from the blood of a prairie chicken which they had killed, and also from the bleeding of sick horses, and that Thatch had been seen in Oklahoma Territory several times after the body was found.

Wilson testified, among other things, as set forth in the bill of exceptions, " that after he was arrested he was taken to Keokuk Falls, where a great crowd of people gathered around him and threatened to mob him, and he was taken before J. B. George, who proceeded to examine him in the presence of the crowd without giving him the benefit of counsel, or warning him of his right of being represented by counsel, or in any way informing him as to his right to be thus represented."

On behalf of the United States a written statement purporting to have been made by Wilson before J. B. George was offered in evidence and objected to " on the ground that it was not voluntary;" whereupon J. B. George was examined on be-

half of the government and testified that he was a United States commissioner; that Wilson was brought to his office at night; there was a crowd at the door and talk of mobbing; and he directed him to be turned over to the city marshal to be taken to jail; that he examined him the next day, and that the statement was his statement as made and written down at the time; that he read the charges to Wilson and went on and examined him, and he answered the questions; that he was not represented by any attorney; that witness had the questions and answers taken down by others than himself, but did not read them over to Wilson as he remembered; it was just Wilson's statement of the case; that Wilson voluntarily made the statement — that is, he (George) asked the questions and Wilson went on and answered them. He did not tell Wilson that he had a right to answer or not as he chose, or advise him as to his rights, or tell him he had the right to be represented by counsel; that there were a dozen or more present; that there had been a talk of mobbing before Wilson was interrogated. The witness said that he told Wilson that the bed clothes and the axe showed his guilt, but that was not before he made the statement but at the winding up; that other witnesses were examined, but not in the presence of Wilson. George was asked whether "the statement was made freely and voluntarily," and answered "Yes, sir. I stated the charge to him and went on and asked him these questions and he answered them, and that is what was done. He went on and made these replies to my questions." One Edmons testified that he wrote down some of the questions and answers and did it correctly. The statement was then again offered in evidence, defendant objected, his objection was overruled, the statement admitted, and he excepted. This statement was throughout a denial of guilt, but contained answers to questions which were made the basis for contradiction on the trial.

The district attorney offered in evidence a picture purporting to be that of Thatch. Defendant objected to its introduction, his objection was overruled, and he excepted.

The court charged the jury, among other things, as follows:

(1) "The law says that if a man has been killed, and killed

in such a way as to show that it was done murderously under the law I have given you defining the crime of murder, then you are to look to see whether the party accused of the killing was found in possession of any of the property of the man killed. If so, that is the foundation for a presumption. It is not conclusive in the beginning, but it is a presumption which you are to look at just as you would look at it as reasonable men outside of the jury box. The party so found in possession of such property, recently after the crime, is required to account for it, to show that as far as he was concerned that possession was innocent and was honest. If it is accounted for in that way then it ceases to be the foundation for a presumption. If it is not accounted for in that satisfactory, straightforward and truthful way that would stamp it as an honest accounting, then it is the foundation for a presumption of guilt against the defendant in this case, just upon the same principle if a certain man is charged with robbery or larceny, and is found in the possession of the property stolen or robbed recently after the crime, he is called upon to explain that possession. If his explanation of it is truthful; if it is consistent; if it is apparently honest; if it is not contradictory; if it is the same at all times; if it has the indicia of truth connected with it, that may cause to pass out of the case the consideration of the presumption arising from the possession of the property, but if it is not explained in that way it becomes the foundation of a presumption against the party who is thus found in possession of that property.

(2) " Now, that is not the only foundation for a presumption, but you take into consideration the very appearance of this property, whether there were blood stains upon it, indicating that there was blood of some kind there; and, if so, whether that fact has been satisfactorily explained by the defendant in this case. If not, whether, in your judgment, there is that in these numerous blood stains upon these clothes, bed clothing, and found upon the straw in that bed, whether or not that fact, if it has not been satisfactorily explained, is a fact upon which you may base a presumption that there was an act of deadly violence perpetrated while the party was

upon these bed clothes, or while he was connected with them in such a way as that the blood was the blood of the murdered man or the missing man.

(3) "Now, another foundation of a presumption is the fact of his false statements. . . . If a man makes a statement to you today about a transaction, which is one thing, and details to you another one tomorrow, which is something else, and another again, which is something else, you necessarily call upon him to explain why he has made these contradictory statements, because you know they are not the attributes of truth; you know they do not belong to the truth, because the highest attribute which it possesses is harmony, is consistency, and it possesses these attributes at all times. . . . . Therefore, if statements in this case before you, which are false, were made by the defendant or upon his side of the case; if they were made by his instigation, and they were knowingly instigated by him, you have a right to take into consideration the falsehoods of the defendant, first to see whether they are falsehoods. Then you are to look at them to see whether he satisfactorily explains to you the making of these false statements, and if he does not they are the foundation of a presumption against him for the reasons I have given you, because if they are not in harmony with nature, if they are not in harmony with truth, if they do not speak the voice of truth, then they speak the voice of falsehood; they speak the voice of fraud; they speak the voice of crime, for they are not in harmony with that great law of truth which in all of its parts is consistent and harmonious. Then look at these statements and view them not alone, but in connection with the other circumstances in the case — all the other circumstances which have gone before you as evidence — to see whether or not the conduct which is urged by the government as accusatory, as inculpatory, has been satisfactorily explained by the defendant upon the theory of his innocence. If so, then that conduct passes away as proving facts in the case. It is no longer the foundation as proving facts for a presumption; but if these explanations are not satisfactory, if they are not in harmony with the truth, the presumption must remain in the

case, and you have a right to draw inferences from these circumstances I have named.

  *   *   *   *   *

(4) " The defendant goes upon the stand in this case, and you are to view his evidence in the light of his relation to the case, in the way I have named, and in addition thereto you are to look at all the other facts and circumstances in the case as bearing upon his evidence to see whether it contradicts what he says, and therefore weakens it; whether it is so as to be contradictory and inconsistent from statements made by him at other times; whether it is shown to lack these elements of truthfulness known as rationality, known as consistency, known as naturalness.

" Whether these things are all absent from it, or whether in your judgment it seems to be consistent and probable in itself when you come to look at the story and listen to it and weigh it by your judgment. If it has these attributes they are evidences of its being true. If it hasn't them, but has the opposite, this opposite condition made up of these circumstances is an evidence of its being false."

The defendant saved exceptions to each of the foregoing instructions numbered 1, 2, 3 and 4.

Errors were assigned to the admission of the picture; the admission of the statement; and the giving of instructions.

No appearance for plaintiff in error.

*Mr. Solicitor General* and *Mr. Assistant Attorney General Dickinson* for defendants in error submitted on their brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence. 1 Greenl. Ev. (15th ed.) § 34. In *Rickman's case,* 2 East P. C.

1035, cited, it was held that on an indictment for arson, proof that property was in the house at the time it was burned, and was soon afterwards found in the possession of the prisoner, raises a probable presumption that he was present and concerned in the offence; and in *Rex* v. *Diggles*, (Wills Cir. Ev. *53,) that there is a like presumption in the case of murder accompanied by robbery. Proof that defendant had in his possession, soon after, articles apparently taken from the deceased at the time of his death is always admissible, and the fact, with its legitimate inference, is to be considered by the jury along with the other facts in the case in arriving at their verdict. *Williams* v. *Commonwealth*, 29 Penn. St. 102; *Commonwealth* v. *McGorty*, 114 Mass. 299; *Sahlinger* v. *People*, 102 Illinois, 241; *State* v. *Raymond*, 46 Connecticut, 345; Whart. Cr. Ev. § 762.

The trial judge did not charge the jury that they should be controlled by the presumption arising from the fact of the possession of the property of one recently murdered, but that they might consider that there was a presumption and act upon it, unless it were rebutted by the evidence or the explanations of the accused.

Again, the existence of blood stains at or near a place where violence has been inflicted is always relevant and admissible in evidence. Wharton Crim. Ev. § 778; *Commonwealth* v. *Sturtivant*, 117 Mass. 122. The trial judge left it to the jury, if they found that there were blood stains and that the defendant had not satisfactorily explained them, to draw the inference, in the exercise of their judgment, that there was an act of deadly violence perpetrated against a person while upon or connected with the bed clothing. In other words, that the jury might regard blood stains not satisfactorily explained as a circumstance in determining whether or not a murder had been committed.

Nor can there be any question that if the jury were satisfied from the evidence that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right not only to take such statements into consideration in connection with all the other circumstances of the case in

determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defence made or procured to be made as in themselves tending to show guilt. The destruction, suppression or fabrication of evidence undoubtedly gives rise to a presumption of guilt to be dealt with by the jury. 1 Greenl. § 37; 3 Id. § 34; *Commonwealth* v. *Webster*, 5 Cush. 295.

The testimony of the defendant in a criminal case is to be considered and weighed by the jury, taking all the evidence into consideration, and giving such weight to the testimony as in their judgment it ought to have. *Hicks* v. *United States*, 150 U. S. 442, 452; *Allison* v. *United States*, 160 U. S. 203. The trial judge did not charge the jury to treat the testimony of defendant in a manner different from that in which they treated the testimony of other witnesses, and left it to them to give to his evidence, under all the circumstances affecting its credibility and weight, such consideration as they thought it entitled to receive.

We cannot reverse this judgment for error in either of the instructions complained of.

No ground of objection is specified to the admission of the picture of Thatch, nor is any particular ground disclosed by the record. It was, we presume, admitted on the question of identity, and as such was admissible in connection with the other evidence. *Udderzook* v. *Commonwealth*, 76 Penn. St. 340; *Cowley* v. *People*, 83 N. Y. 464; *Ruloff* v. *People*, 45 N. Y. 213; *Luke* v. *Calhoun County*, 52 Alabama, 115; *Franklin* v. *State*, 69 Georgia, 36. And see *Luco* v. *United States*, 23 How. 515.

This brings us to consider the exception taken to the admission of defendant's statement in evidence. The ground of the objection was that it was not voluntary. Although his answers to the questions did not constitute a confession of guilt, yet he thereby made disclosures which furnished the basis of attack, and whose admissibility may be properly passed on in the light of the rules applicable to confessions. Of course, all verbal admissions must be received with caution, though free,

deliberate and voluntary confessions of guilt are entitled to great weight. But they are inadmissible if made under any threat, promise, or encouragement of any hope or favor. 1 Greenl. Ev. §§ 214, 215, 219.

In *Hopt* v. *Utah*, 110 U. S. 574, 584, Mr. Justice Harlan, delivering the opinion of the court, remarked : " While some of the adjudged cases indicate distrust of confessions which are not judicial, it is certain, as observed by Baron Parke in *Regina* v. *Baldry*, 2 Den. Cr. Cas. 430, 445, that the rule against their admissibility has been sometimes carried too far, and in its application justice and common sense have too fre-quently been sacrificed at the shrine of mercy. A confession, if freely and voluntarily made, is evidence of the most satisfactory character. Such a confession, said Eyre, C. B., 1 Leach, 263, ' is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and, therefore, it is admitted as proof of the crime to which it refers.' Elementary writers of authority concur in saying that, while from the very nature of such evidence it must be subjected to careful scrutiny and received with great caution, a deliberate, voluntary confession of guilt is among the most effectual proofs in the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession. 1 Greenleaf Ev. § 215; 1 Archbold Cr. Pl. 125; 1 Phillips Ev. 533–34; Starkie Ev. 73.

" But the presumption upon which weight is given to such evidence, namely, that one who is innocent will not imperil his safety or prejudice his interests by an untrue statement, ceases when the confession appears to have been made either in consequence of inducements of a temporal nature, held out by one in authority, touching the charge preferred, or because of a threat or promise by or in the presence of such person, which, operating upon the fears or hopes of the accused, in reference to the charge, deprives him of that freedom of will or self control essential to make his confession voluntary within the meaning of the law. Tested by these conditions, there seems to have been no reason to exclude the confession of the accused; for the existence of any such in-

ducements, threats or promises seems to have been negatived by the statement of the circumstances under which it was made."

In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.

The same rule that the confession must be voluntary is applied to cases where the accused has been examined before a magistrate, in the course of which examination the confession is made, as allowed and restricted by statute in England and in this country in many of the States. Gr. Ev. § 224. But it is held that there is a well. defined distinction between an examination when the person testifies as a witness and when he is examined as a party accused; *People* v. *Mondon*, 103 N. Y. 211; *State* v. *Garvey*, 25 La. Ann. 191; and that where the accused is sworn, any confession he may make is deprived of its voluntary character, though there is a contrariety of opinion on this point. Gr. Ev. § 225; *State* v. *Gilman*, 51 Maine, 215; *Commonwealth* v. *Clark*, 130 Penn. St. 641; *People* v. *Kelley*, 47 California, 125. The fact that he is in custody and manacled does not necessarily render his statement involuntary, nor is that necessarily the effect of popular excitement shortly preceding. *Sparf* v. *United States*, 156 U. S. 51; *Pierce* v. *United States*, 160 U. S. 355; *State* v. *Gorham*, 67 Vermont, 365; *State* v. *Ingram*, 16 Kansas, 14. And it is laid down that it is not essential to the admissibility of a confession that it should appear that the person was warned that what he said would be used against him, but on the contrary, if the confession was voluntary, it is sufficient though it appear that he was not so warned. Joy on Confessions, *45, *48, and cases cited.

In the case at bar defendant was not put under oath, and made no objection to answering the questions propounded. The commissioner testified that the statement was made freely and voluntarily, and no evidence to the contrary was adduced. Nor did defendant when testifying on his own behalf testify to the contrary. He testified merely that the commissioner examined him " without giving him the benefit

of counsel or warning him of his right of being represented by counsel, or in any way informing him of his right to be thus represented." He did not testify that he did not know that he had a right to refuse to answer the questions, or that, if he had known it, he would not have answered. His answers were explanations, and he appeared not to be unwilling to avail himself of that mode of averting suspicion. It is true that, while he was not sworn, he made the statement before a commissioner who was investigating a charge against him, as he was informed; he was in custody but not in irons; there had been threats of mobbing him the night before the examination; he did not have the aid of counsel; and he was not warned that the statement might be used against him or advised that he need not answer. These were matters which went to the weight or credibility of what he said of an incriminating character, but as he was not confessing guilt but the contrary, we think that, under all the circumstances disclosed, they were not of themselves sufficient to require his answers to be excluded on the ground of being involuntary as matter of law.

When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant. *Commonwealth* v. *Preece*, 140 Mass. 276; *People* v. *Howes*, 81 Michigan, 396; *Thomas* v. *State*, 84 Georgia, 613; *Hardy* v. *United States*, 3 Dist. Col. App. 35. The question here, however, is simply upon the admissibility of the statement; and we are not prepared to hold that there was error in its admission in view of its nature and the evidence of its voluntary character; the absence of any threat, compulsion or inducement; or assertion or indication of fear; or even of such influence as the administration of an oath has been supposed to exert.

*Judgment affirmed.*