UNITED STATES, Appellee,

v.

Rodolfo M. COLCOL, Sergeant, U.S. Air Force, Appellant.

No. 44,192.
ACM S25468.

U.S. Court of Military Appeals.

Nov. 21, 1983.

For Appellant: *Colonel George R. Stevens* (argued).

For Appellee: *Captain Brenda J. Hollis* (argued); *Colonel Kenneth R. Rengert,*

*Captain Kathleen A. McGah,* USAFR (on brief).

## Opinion of the Court

EVERETT, Chief Judge:

A special court-martial with members tried appellant at Clark Air Base, Republic of the Philippines, on a charge preferred under Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934. According to the first specification of this charge, on September 19, 1981, Colcol stole "certain mail matter"—namely, "a package containing ... [a] stereo receiver addressed to Chester A. White"—"which ... was then in the security cage of the 374th Aerial Port Squadron, an official agency for the transmission of mail." A second specification alleged that on the same date Colcol wrongfully solicited Airman First Class Rick A. Hollinger to steal this same stereo receiver "by requesting the said Airman First Class Rick A. Hollinger to remove the said package from the security cage and transport the said package to Building 7501."

Appellant was found guilty as charged and sentenced to a bad-conduct discharge, as well as confinement and forfeiture of $206.00 pay per month for 4 months, and reduction to E–2. The convening and supervisory authorities approved the findings and sentence; in turn, the United States Air Force Court of Military Review affirmed. We granted review of these issues:

I

WHETHER THE MILITARY JUDGE ERRED IN REFUSING TO PERMIT DEFENSE COUNSEL TO CROSS–EXAMINE A1C RICK A. HOLLINGER REGARDING AN AFM 39–12 SECTION F DISCHARGE . PROVIDED HIM IN LIEU OF COURT–MARTIAL FOR HIS INVOLVEMENT IN THE INCIDENT FOR WHICH APPELLANT WAS TRIED.

II

WHETHER THE MILITARY JUDGE IMPROPERLY INSTRUCTED THE COURT REGARDING THE CONDUCT OF THE APPELLANT WHEN CONFRONTED WITH A CRIMINAL CHARGE PRIOR TO TRIAL AS SHOWING CONSCIOUSNESS OF GUILT.

Although we have concluded that the military judge unduly restricted cross-examination and should have omitted the challenged instruction, we have determined that these errors were not prejudicial.

I

After an Article 39(a) [1] session to consider a defense [2] motion to suppress, and after challenges to court members and an opening statement by trial counsel, the Government called Senior Master Sergeant Wilburn E. Lilly as its first witness. He testified that his duties as Superintendent of Air Freight included supervision of the security cage where mail was kept, along with other types of cargo that required special attention or increased security. A limited number of people worked in the security cage, and it was subject to "controlled access," so that only those persons could enter whose names appeared on "an access list on the door."

Appellant worked for Sergeant Lilly and had unescorted access to the security cage. However, Airman First Class Rick Hollinger, who worked in cargo processing, could enter the security cage only if someone let him in. Because of the high theft rate at Clark Air Base, all mail was kept in the security cage. On September 19, 1981, "there probably weren't more than 20 people, at the most," who were allowed access to the security cage and who could have let Hollinger in. Colcol was among those people. Normally, there would have been no more than three persons on duty within the cage who could have allowed Hollinger to enter. Prosecution exhibit 2—a box in the original packing and containing a stereo

---

1. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

2. Appellant was defended not only by military defense counsel but also by a Filipino attorney.

receiver—was in the mail enroute to Diego Garcia, and, according to Sergeant Lilly, there was no legitimate purpose for taking this box out of the security cage.

Airman Hollinger testified that on September 19, he worked in the warehouse with the 374th Aerial Port Squadron and did not have "unescorted access" to the security cage. Appellant had asked him to move a box which was sitting on the floor in the cage and which was about the same size and shape as prosecution exhibit 2.[3] Pursuant to this request, he removed the box from the cage on a forklift, where Colcol had placed it. Hollinger took the box to the area where forklifts were checked in and out.

By arrangement with Colcol, Hollinger then carried the box in appellant's car to Barracks 7501. There, he asked "Kevin Schwartz, . . . [whose] light was on, . . . if he would hold this box for Sergeant Colcol until the morning so he could come and pick it up." Appellant had told Hollinger that he would pick the box up from the barracks, but he had not stated "where he was going to take it from there." Hollinger only observed that "it was a brown rectangular box" and "didn't notice any labels."

On cross-examination of Hollinger, the defense sought to inquire about his submission of a request for an administrative discharge in lieu of court-martial. Trial counsel objected "to that whole line of questioning and ask[ed] that the members not be given that information, that they be instructed not to speculate as to the disposition of Airman Hollinger's case." When the military judge sustained the objection, defense counsel requested an Article 39(a) session. During this session, he explained:

> Your Honor, we have information in this case that Airman Hollinger submitted a request for discharge in lieu of a court-martial. Rather than stand trial for his part of the theft, he has submitted a request for discharge. His request for discharge has been approved by the Com-

mander of 13th Air Force, and it's going to be executed as soon as he finishes testifying in this case. I think it certainly goes to show any prejudice he's going to have concerning the nature of his testimony in this case. In other words, he has nothing to lose by testifying.

The military judge interrupted with a comment, "Well, you can look at the specifications and see that he's implicated in the case—that's not proof, of course." To this, defense counsel replied, "Well, Your Honor, also, he's going to be leaving Clark Air Base without a federal conviction. He's going to get an administrative discharge and he's not going to face the—"; and thereafter he amplified this point by emphasizing, "I'm just saying that's going to show some kind of prejudice on his case to come in and testify; he has nothing to lose now to come in and testify."

Trial counsel responded that this evidence was "simply not admissible before this court"; and he also contended that, under the standards of the American Bar Association, Hollinger should "not . . . be cross-examined concerning truthfulness when the cross-examiner knows him to be telling the truth." Ultimately, the judge ruled:

> I'm not going to allow any evidence of testimony in regard to the fact that this witness, Airman Hollinger, has been authorized an administrative discharge in lieu of court-martial. I don't think that goes to the guilt or innocence of the accused.

Airman First Class Kevin D. Schwartz testified that, in "the early morning hours" of September 19, 1981, Hollinger "asked if he could put some stereo equipment in my room." When Schwartz gave his permission, Hollinger "came back about 30 seconds later with a box"—which was the same one that had been identified at trial as prosecution exhibit 2. Schwartz had never touched the box or seen its contents, but "I knew it was stereo because he told me." Some four hours later, Hollinger and an agent of the

---

**3.** The box was addressed from Pacific Mail Order Warehouse AAFES Catalog Sales to Chester A. White, E–5, aboard the USS California, FPO New York, which was at Diego Garcia.

Air Force Office of Special Investigations (OSI) came into Schwartz' room, and the agent took the box.

Special Agent K.J. Byers of the OSI testified that, while on duty on the morning of September 19, 1981, he "received information that Sergeant Colcol and Airman Hollinger had diverted an item of mail from the MAC security cage." As a result of this information, Byers contacted Hollinger, who told him that the package was in the barracks. Thereupon, Byers retrieved the box from Schwartz' room. This box, containing a stereo receiver, was prosecution exhibit 2.

Shortly before 8:00 a.m. on September 19, Byers met appellant at the main gate, and they proceeded back to the OSI office. Cross-examination revealed that initially Colcol "stated that he was not involved in any illegal activity and will give a statement to that effect." However, in a second interview several hours later he made a confession which was introduced in evidence as prosecution exhibit 1. Byers explained further during cross-examination that initially appellant "was willing to lie." From the evidence he already had at the time of the initial interview, Byers was sure that in denying involvement in any illegal activity, appellant "was telling . . . a lie."

After Byers had testified, the Government rested, whereupon the defense moved unsuccessfully for a finding of not guilty. Then, the defense called Hollinger as its lead-off witness. Hollinger described the circumstances under which Special Agent Byers had taken his statement. Thereafter, Colcol testified in his own behalf that he had been on duty early on the morning of September 19 and had "told . . . [Hollinger] he could bring a box for me." However, this box was about half the size of prosecution exhibit 2, and it contained plexiglass, which "was scrap that I got from the carpenter shop." Appellant knew that Hollinger took the box, but he did not know where he took it; indeed, Colcol never saw the box again. Appellant had loaned Hollinger his car, since "he wanted to go to chow and he wanted to use my car; he was going downtown."

When Colcol saw Hollinger later about 3:45 a.m., Hollinger "told . . . [him] that my box was in Airman Schwartz' room." Colcol described how he subsequently met with Special Agent Byers, who informed appellant that he was "suspected of theft of mail and a conspiracy to divert mail matters." However, some delay occurred that morning before an interview took place. In his testimony, appellant repudiated some portions of his written statement given to Special Agent Byers.

At the conclusion of this testimony, the defense rested, whereupon the Government recalled Special Agent K.J. Byers as a rebuttal witness. His description of his interview with appellant on September 19 was quite different from that provided by Colcol. Special Agent Charles E. Johnson, Jr., who had been present in the interview room, also testified concerning the interview of appellant. According to him, Colcol never told him "during the course of that interview that '. . . what he and Airman Hollinger had taken was a box of scrap plexiglass." However, Colcol did mention that "his friend wanted plexiglass."

Technical Sergeant William B. Galvin also testified as a rebuttal witness for the prosecution. In the morning of September 19, 1981, he worked at the security cage, where he was a noncommissioned officer in charge. When he

went out from the . . . security cage to check the mail pallets . . . [bound for] Diego Garcia . . . [Galvin] noticed on a forklift where Sergeant Hollinger and Sergeant Colcol were conveying [sic] with each other, a box that I recognized as US mail because I handle it all the time. And to my knowledge, at that time there was no need for a single piece of mail to be going out of the cage area. I checked the pallets, and in the meantime in checking my pallets out there, Sergeant Hollinger and Sergeant Colcol finished talking and Sergeant Hollinger departed with the forklift with the said box on it. Sergeant Colcol had opened the door to let him out.

As a result of his observations, Galvin notified others that he "suspected something was going on."

During an Article 39(a) session on pre-findings instructions, trial counsel requested this instruction:

The conduct of an accused including statements made and acts done upon being informed that a crime has been committed or upon being confronted with a criminal charge, may be considered by the court in the light of other evidence in the case in determining the guilt or innocence of the accused. When an accused voluntarily offers an explanation or makes some statement tending to establish his innocence, and such explanation as taken is later shown to be false, the court may consider whether this circumstantial evidence points to a consciousness of guilt. It is reasonable to infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence. Whether or not evidence as to an accused's voluntary explanation or statement points to a consciousness of guilt and the significance, if any, to be attached to any such evidence are matters for determination by you, the court.

When the defense objected, the judge announced that he wanted to read the case—*United States v. Opalka,* 36 C.M.R. 938 (A.F.B.R.1966), *pet. denied,* 16 U.S.C.M.A. 658, 36 C.M.R. 541 (1966)—which trial counsel had cited as authority, and he recessed court for that purpose. Although the judge did not specifically rule on trial counsel's request when court reconvened, he later gave the requested instruction almost verbatim to the court members. At the close of the judge's instructions, defense counsel renewed his objection.

## II

In *United States v. Webster,* 1 M.J. 216 (C.M.A.1975), we ruled that the Government must notify the defense of any grants of immunity to prosecution witnesses. The premise for this ruling was that the defense should be provided this information because "a grant of immunity [to a prosecution witness] is a powerful circumstance affecting credibility." *Id.* at 219.

In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the United States Supreme Court reversed a conviction because of failure of the prosecutor to reveal the true facts after a prosecution witness had testified falsely that he had been promised no consideration for his testimony. Undoubtedly, the rationale for this holding was that any assurance of favorable treatment—*i.e.,* a recommendation for reduction of his sentence—to a prosecution witness was relevant to his credibility. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1970).

In the case at bar, Hollinger had apparently been an accomplice of appellant in removing the box containing the stereo receiver from the security cage. However, instead of being tried by court-martial, he was to receive an administrative discharge. For all practical purposes, the promise of the discharge was equivalent to a promise of transactional immunity, since, upon receiving the discharge, Hollinger could no longer be tried by court-martial. *See United States v. Andreas,* 14 M.J. 483 (C.M.A. 1983). Under these circumstances defense counsel was entitled to cross-examine Hollinger about the promised administrative discharge.

The Government argues that, since the discharge already had been approved, Hollinger knew that he would receive the benefit of separation from the Air Force without being tried by court-martial for his role in stealing the stereo receiver. Therefore, he had no continuing incentive to testify falsely in the Government's behalf. We are unsure whether, at the time of trial, the discharge was still subject to rescission —or, more importantly, whether Hollinger believed that it might not be issued to him unless he testified in a certain way. However, even if issuance of the administrative discharge was a certainty, and Hollinger knew this fact, his cross-examination about the administrative discharge would still have been proper. The anticipated receipt of this benefit from the Government might well tend to create a bias or prejudice on his part in favor of the prosecution.

■ Furthermore, in inducing approval of the issuance of the administrative discharge, Hollinger may have made statements concerning the theft of the stereo receiver. Trial defense counsel were entitled to discover if any such statements were inconsistent with Hollinger's testimony on direct examination. *United States v. Clark,* 24 C.M.R. 430 (A.B.R.1957).

### III

■ The instruction requested by trial counsel and given by the judge announces a correct principle of law.[4] Indeed, in *United States v. Opalka, supra*—the precedent relied on by trial counsel—the Air Force Board of Review called attention to applicable military precedents and to the Supreme Court's approval of the principle that false statements by an accused in explaining an alleged offense may themselves tend to show guilt. *See Wilson v. United States,* 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896). However, like the Court of Military Review, we doubt the applicability of this principle to the facts of the present case.

Apparently, trial counsel predicated the requested instruction on Colcol's general denial of any illegal activity when he was initially interviewed by Special Agent Byers. However, unlike a false explanation or alibi given by a suspect when he is first confronted with a crime, his general denial of guilt does not demonstrate any consciousness of guilt. Moreover, in order to decide that an accused's general denial of illegal activity is false, the factfinder must decide the very issue of guilt or innocence; and so the instruction would only tend to produce confusion because of its circularity.

At trial, Colcol testified in his own defense that the box removed from the security cage had contained only plexiglass, which was scrap rather than mail matter. This exculpatory version of events was thoroughly discredited by government witnesses. If trial counsel and the military judge had in mind the implausible testimony given by appellant at his trial, then the princi-

ple might apply that a false explanation tends to show a consciousness of guilt. However, the language of the instruction leaves in doubt that this application was intended by the judge, and the discussion of the requested instruction was so brief that it provides no insight in this regard. Moreover, if the military judge intended to advise the court members that they might infer his consciousness of guilt from any false testimony he had given, the instruction might tend to indicate a belief by the judge that Colcol's testimony was false. *Cf. United States v. Opalka, supra.* Insofar as an accused's false testimony at trial is concerned, the judge can best leave to the prosecutor the task of persuading the factfinder that this falsity in itself was an indication of guilt.

### IV

■ Although the judge should have allowed defense counsel to question Hollinger about his pending administrative discharge, we are convinced that this error did not affect the outcome of the trial. In addition to Hollinger's testimony, the Government presented that of another eye-witness, Colcol's own confession, and extensive corroborative evidence. In short, even if Hollinger's credibility had been further impeached by evidence as to the pending discharge, the evidence of appellant's guilt was overwhelming.

■ The trial judge gave an instruction which was correct in the abstract but was inapplicable to the facts. While the court members were probably confused as to the judge's reason for giving the instruction, they could hardly have been misled by it. The evidence of guilt was too unerring for the outcome here to be affected by the judge's instruction on consciousness of guilt.

### V

The decision of the United States Air Force Court of Review is affirmed.

Judges COOK and FLETCHER concur.

---

4. Of course, an accused's prearrest silence usually is inadmissible in evidence and is not an act or statement from which guilt can be inferred. *See United States v. Fitzpatrick,* 14 M.J. 394, 398 (C.M.A.1983), and cases cited therein.