*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and COGLEY
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Jonathan QUEZADA**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201900115**

Decided: 26 October 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Matthew J. Kent (motions)
John L. Ferriter (arraignment, motions, and trial)

Sentence adjudged 19 December 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: confinement for six years and a dishonorable discharge.

For Appellant:
*Lieutenant Daniel O. Moore, JAGC, USN*
*Captain Nicholas S. Mote, USMC*

For Appellee:
*Major Kerry E. Friedewald, USMC*
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*

Judge COGLEY delivered the opinion of the Court, in which Chief Judge MONAHAN and Senior Judge STEPHENS joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under NMCCA
Rule of Appellate Procedure 30.2.**

_____

COGLEY, Judge:

Appellant was convicted, contrary to his pleas, of one specification of violating a lawful general order by providing alcohol to a minor, one specification of making a false official statement, one specification of sexual assault by bodily harm, and one specification of abusive sexual contact by bodily harm under Articles 92, 107, and 120 of the Uniform Code of Military Justice [UCMJ].[1]

Appellant raises four assignments of error [AOE]: (1) the military judge undermined Appellant's presumption of innocence by instructing members on false exculpatory statements in a case where Appellant was charged with a false official statement for the same statement[2]; (2) the military judge erred by instructing the members to disregard evidence of Appellant's deportation as a result of the conviction; (3) the military judge erred in admitting, over Defense objection, the prior statement of the victim under Military Rule of Evidence [Mil. R. Evid.] 801(d)(1)(B)(ii); and (4) the promulgating order fails to comply with Rule for Court-Martial [R.C.M.] 1114(c) because it does not accurately reflect the charges upon which Appellant was arraigned and the outcome of those charges.

We agree that Appellant is entitled to an accurate promulgating order. We take corrective action in our decretal paragraph and order a corrected promulgating order pursuant to *United States v. Crumpley*.[3] We find no prejudicial error and affirm the findings and sentence.

_____

[1] 10 U.S.C. §§ 892, 907, 920 (2016).

[2] Appellant uses the word "averment" as the final word in the first AOE in the Appellant's Brief in several places (*see* Appellant's Br. ii, 1, 10), but we substitute the word "statement" to better align with the language of Article 107, UCMJ and the conduct for which Appellant was convicted.

[3] 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

## I. BACKGROUND

During the summer of 2017, Appellant and his wife, Ms. Quebec,[4] hosted Appellant's 17-year old sister-in-law, Ms. Alpha, at their residence in military housing at Camp Pendleton prior to her resuming high school. On July 14, 2017, Appellant hosted a cookout in his backyard with several guests. At a certain point in the evening, most of the guests left. Appellant and Ms. Alpha were drinking shots of Jack Daniels whiskey throughout the evening. Appellant challenged her to keep up and she went along with it. By Ms. Alpha's count, she consumed ten shots of whiskey over the course of the evening and into the night.

Later in the evening, Appellant's wife, Ms. Quebec, went to bed, leaving only Appellant, Ms. Alpha, and another Marine sitting in the living room of the residence talking and listening to music. Sometime after that, Ms. Alpha felt sick and she vomited in the downstairs bathroom. After that, Appellant gave the other Marine a blanket to sleep on the couch. Ms. Alpha also wanted to sleep downstairs, but Appellant insisted that she sleep upstairs. The two of them proceeded to the bedroom of Appellant's six-year-old son, where Ms. Alpha had been sleeping during her stay. Appellant's son was in bed with his mother, Ms. Quebec, in another bedroom.

Ms. Alpha curled up on the bed and Appellant got into the bed next to her. At a certain point, Appellant got out of the bed, retrieved the bottle of whiskey and shot glasses and brought them to his son's bedroom. Appellant took another shot and gave one to Ms. Alpha. After taking her eleventh shot, Ms. Alpha vomited a second time in an upstairs bathroom. When she returned to the bed, Appellant cuddled up next to her. He started to bite her ear and forcefully grope her breasts. Appellant tried to pull Ms. Alpha's shorts down while she tried to pull them back up. Appellant then moved the lining of her shorts and underwear aside and began licking her vagina and anus. Ms. Alpha felt Appellant's tongue penetrate her vagina. During the course of these events, Ms. Alpha began crying and telling Appellant to "not do it" because "he is with [her] sister," because her sister "is [her] flesh and blood" and because "he has a kid with [her] sister." As she cried louder and pushed him off, he stopped, got off the bed, and lay down on the floor. Appel-

---

[4] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

lant asked Ms. Alpha to keep it a secret, but she told him she cannot keep secrets that big.

Within a few minutes, Appellant fell asleep where he lay on the floor. Very shortly after that, having gotten out of bed to get some water and realizing Appellant was not in bed with her, Ms. Quebec came into the bedroom where Ms. Alpha and Appellant were. By this point, it was about five o'clock in the morning. Ms. Alpha had rolled over toward the wall and was texting a friend. Ms. Quebec noted Appellant sleeping on the floor, but at this point, apparently, did not realize anything was seriously amiss. Ms. Quebec spoke to Ms. Alpha briefly about going to a parade in San Diego later that day, though Ms. Alpha did not respond. Ms. Quebec then started downstairs to get a glass of water. Ms. Alpha got up from the bed, followed her downstairs, and asked Ms. Quebec to come outside. Once outside, Ms. Alpha told Ms. Quebec what happened, telling her sister something along the lines of "he went down on [me]."

Ms. Quebec was very upset and went into the house and confronted Appellant immediately. She kicked him to wake him up and used a loud voice to ask him, something along the lines of, "why would you do something like that to my sister?" Appellant kept asking Ms. Quebec "what did she say?" or "what are you talking about?" Ms. Quebec threatened to call the police, but Appellant offered to do it himself and, ultimately, he did. When speaking to the emergency operator and, later to the Desk Sergeant, the reason he gave for the call was that he was being accused of approaching a minor and he wanted to clear it up. When base police arrived, Ms. Quebec told them what happened and showed them the bedroom and bathroom. Based on the recommendation of the responding police, Ms. Quebec took Ms. Alpha to get DNA testing at a medical facility in Temecula and then to the Naval Criminal Investigative Service [NCIS] office at Camp Pendleton to make a statement. While they were at the medical facility, Ms. Alpha was interviewed by a Sexual Assault Nurse Examiner [SANE] about what happened. The SANE also collected DNA samples from Ms. Alpha's vagina, anus, and ears.

About a week later, Ms. Alpha contacted NCIS to say she wanted to stop the case because her sexual encounter with Appellant was "consensual." At trial, Ms. Alpha ultimately testified consistently with her statement to the SANE and her first statement to NCIS.

Appellant also gave a statement to NCIS. He verbally denied that he licked Ms. Alpha's vagina and shook his head "no" when asked about that specific allegation.

The DNA samples collected from Ms. Alpha's vagina, anus, and left ear matched Appellant's DNA to a degree that made it extremely unlikely that anyone but Appellant was the source of DNA found in those three samples.

At trial, the members found Appellant guilty of all charges and specifications. During the pre-sentencing hearing, Appellant offered an unsworn statement. In the unsworn statement, Appellant twice stated that because of his convictions, he would likely be deported to Mexico.

## II. DISCUSSION

### A. Instructing Members on False Exculpatory Statements

Appellant asserts the military judge erred by providing the members an instruction on false exculpatory statements for the same statement by Appellant for which he was also charged with making a false official statement. Whether the members were properly instructed is a question of law we review de novo.[5]

> In regard to form, a military judge has wide discretion in choosing the instructions to give but has a duty to provide an accurate, complete, and intelligible statement of the law. In reviewing the propriety of an instruction, appellate courts must read each instruction in the context of the entire charge and determine whether the instruction completed its purpose.[6]

The military judge gave the standard Benchbook instruction for False Exculpatory Statements.[7] The instruction as given by the military judge was as follows:

> There has been evidence that after the offenses were allegedly committed, the accused may have made a false statement or given a false explanation about the alleged offenses.
>
> Conduct of an accused, including statements made and acts done upon being informed that a crime may have been committed or upon being confronted with a criminal charge, may be

---

[5] *United States v. Hale,* 78 M.J. 268, 274 (C.A.A.F. 2019).

[6] *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted).

[7] *See* Dep't of the Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, ¶ 7-22 (Sep. 10, 2014). [Benchbook]

considered by you in light of other evidence in the case in determing the guilt or innocence of the accused.

If an accused voluntarily offers an explanation or makes some statement tending to establish his innocence, and such explanation or statement is later shown to be false, you may consider whether the circumstantial evidence points to consciousness of guilt. You may infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence. The drawing of this inference is not required.

Whether the statement that was made was voluntary or false is for you to decide.

You may also properly consider the circumstances under which the statements were given, such as whether they were given under oath, and the environment under which they were given.

Whether evidence as to an accused's voluntary explanation or statements point to a consciousness of guilt, and the significance, if any, to be attached to any such evidence are matters for determination by you, court members.[8]

The standard instruction has been validated in three military cases: *United States v. Opalka*,[9] *United States v. Colcol*,[10] and *United States v. Mahone*.[11] "[F]alse statements by an accused in explaining an alleged offense may themselves tend to show guilt."[12] However, a "general denial of guilt does not demonstrate any consciousness of guilt."[13] To infer consciousness of guilt from a general denial of illegal activity, "the factfinder must decide the very issue of guilt or innocence; and so the instruction would only tend to produce confusion because of its circularity."[14] Unless the alleged false statement is

---

[8] App. Ex. LVII at 6-7.

[9] 36 C.M.R. 938, 944 (A.F.B.R. 1966), *pet. denied*, 36 C.M.R. 541 (C.M.A. 1966).

[10] 16 M.J. 479, 483 (C.M.A. 1983).

[11] 14 M.J. 521 (A.F.C.M.R. 1982).

[12] *Colcol*, 16 M.J. at 484 (citing *Wilson v. United States*, 162 U.S. 613 (1896)).

[13] *Id.*

inherently incredible, independent evidence of the falsity of the statement should be required.[15]

In this case, the civilian defense counsel objected to the instruction at issue, arguing there was potential confusion with Charge II and its sole Specification of making a false official statement in violation of Article 107, UCMJ. But the military judge overruled the objection on the basis that Appellant's statement to NCIS gave rise to it. As shown above, the military judge instructed the members that whether any statement was voluntary or false is for them to decide, and whether it points to consciousness of guilt and the significance to, if any, to be attached to such evidence are matters for them, the court members.

Appellant did not make a general denial of criminal wrongdoing to NCIS; rather, he denied specific conduct. He specifically denied that he licked Ms. Alpha's vagina. However, the act of licking Ms. Alpha's vagina would only satisfy one element of what became Specification 1 of Charge III, sexual assault. Appellant's statement does not resolve the question of whether Ms. Alpha provided her consent to engage in that act, also a key element of the Article 120 offense alleged in Specification 1 of Charge III. Therefore, Appellant's denial to NCIS does not constitute a general denial of wrongdoing.

Additionally, the military judge's instruction did not identify any particular statement the members could consider to be a false explanation. There were multiple false exculpatory statements that came out in the course of the trial. Appellant also gave false explanations to his wife, to the emergency operator and to the Desk Sergeant. For example, when his wife confronted him, he kept asking her "what did she say?" and when she asked why he did that to her sister, he replied "what are you talking about?" Also, when his wife was asked if he ever talked about the DNA evidence, he told her "[t]hat it was going to come out negative."

This is different from *Colcol* where the appellant initially stated he "had not been involved in any criminal activity" and then later confessed.[16] Such a blanket denial of criminal wrongdoing creates a "circularity problem" because the factfinder has to decide the issue of guilt or innocence in order to decide

---

[14] *Id.*

[15] *United States v. Littlefield*, 840 F.2d 143, 149 (1st Cir. 1988).

[16] 16 M.J. at 482.

whether the statement was false. Here, the victim testified that Appellant licked and penetrated her vagina with his tongue. This testimony was corroborated by DNA evidence. However, that act alone was not the crime. Additional evidence was also required to show the act was done without consent. As a result, even if we were only focused on the statement to NCIS, there would not be a circularity problem.

However, it is not necessary to focus solely on Appellant's statement to NCIS. When considering other false exculpatory statements Appellant made that were not the subject of a false official statement offense, the issue of Appellant's consciousness of guilt is clearly raised. As correctly stated in the military judge's instruction, the members may "infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence." Appellant did so multiple times in different contexts.

We find that the military judge did not err in giving the members the standard instruction for False Exculpatory Statements.

## B. Instructing Members to Diregard Appellant's Comments on Deportation in Appellant's Unsworn Statement

Appellant asserts the military judge erred by instructing the members to disregard evidence of Appellant's potential deportation as a result of the conviction. We review a military judge's sentencing instructions for abuse of discretion[17] "In this context, the military judge abuses his discretion when the instructions are based on an erroneous view of the law or are not tailored to the case's facts and circumstances.[18]

R.C.M. 1001(c) permits the presentation of matters in extenuation, mitigation, or rebuttal by an accused through an unsworn statement. Despite the limits of this rule, our superior court has, on the one hand, held that the right to present an unsworn statement is "generally considered unrestricted."[19] On the other hand, an unsworn statement "may be tempered by appropriate instructions from the military judge."[20]

---

[17] *United States v. Talkington*, 73 M.J. 212, 215 (C.A.A.F. 2014) (citing *United States v. Barrier*, 61 M.J. 482, 485 (C.A.A.F. 2005)).

[18] *Talkington* , 73 M.J. at 215 (citations and internal quotations marks omitted).

[19] *United States v. Rosato,* 32 M.J. 93, 96 (C.M.A. 1991).

[20] *United States v. Barrier*, 61 M.J. at 482, 484 (C.A.A.F. 2005).

"A collateral consequence is '[a] penalty for committing a crime, in addition to the penalties included in the criminal sentence.'"[21] "The general rule concerning collateral consequences is that 'courts-martial [are] to concern themselves with the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration.'"[22]

"Sex offender registration is a collateral consequence of the conviction alone, not the sentence."[23] "While an accused may raise a collateral consequence in an unsworn statement, our precedent also makes clear that the military judge may instruct the members essentially to disregard the collateral consequence in arriving at an appropriate sentence for an accused."[24]

By contrast, the Court of Appeals for the Armed Forces [CAAF] ruled in *United States v. Becker* that a military judge erred by refusing to admit defense mitigation evidence of the projected dollar amount of retirement income which the appellant might be denied if a punitive discharge was adjudged.[25] This was because the sentencing authority had within its control an ability to impact the outcome of whether the appellant would be able to receive retirement income by fashioning a sentence that did not include a punitive discharge.[26] A separate issue in *Becker* was whether it mattered if the appellant was already retirement eligible or if there were other contingencies that would have to be satisfied, such as reenlistment, before retirement eligibility.[27] *Becker* was found to be three and one half months' short of retirement eligibility and would not have needed to reenlist; thus, if his sentence had not included a punitive discharge, it was possible that he would have been eligible for retirement income.

---

[21] *United States v. Miller*, 63 M.J. 452, 457 (C.A.A.F. 2006) (alteration in original) (quoting Black's Law Dictionary 278 (8th ed. 1999).

[22] *United States v. Griffin,* 25 M.J. 423, 424 (alteration in original) (quoting *United States v. Quesinberry*, 31 C.M.R. 195, 198 (C.M.A. 1962)).

[23] *Rosato,* 32 M.J. at 95-96.

[24] *Talkington* at 213 (citing *Barrier,* 61 M.J. at 485-86 (C.A.A.F. 2005)); *United States v. Tschip*, 58 M.J. 275, 277 (C.A.A.F. 2003).

[25] 46 M.J. 141, 142 (C.A.A.F. 1997).

[26] *Id*. at 142-43.

[27] *Id*.

Appellant argues that the military judge abused his discretion by instructing the members to disregard Appellant raising the possibility of deportation in his unsworn statement as a matter collateral to sentencing. Appellant asserts that the Supreme Court's holding in *Padilla v. Kentucky* holds that deportation is a "particularly severe penalty" that is "nearly an automatic result" of a criminal conviction.[28] Appellant acknowledges that sex offender registration, however, is a collateral matter and that every state has its own a version of "Megan's Law" making sex offender registration less of a certainty based on a criminal conviction.[29]

In his unsworn statement, Appellant told the members "I'm going to get deported to Mexico for these actions" and that "my immigration lawyer has reported to me that I will be deported because of my actions."[30] Other evidence appears in his service record showing that he is a naturalized U.S. citizen, but there was no discussion of this entry in his service record and no other documents were produced on this issue.[31] In any case, even if there had been such evidence, evidence of this nature is of the kind likely to confuse the members in fashioning an appropriate sentence. This is one of the stated concerns of other courts reviewing the issue of collateral consequences, e.g., "to prevent the waters of the military sentencing process from being 'muddied' by an unending catalogue of administrative information."[32]

Additionally, Appellant misapprehends the context of *Padilla*. In that case, the issue before the Court was whether a lawyer rendered inadequate legal representation under the Sixth Amendment by failing to advise Padilla that deportation could be a consequence of pleading guilty to possession of marijuana.[33] Under those circumstances, the Court held that:

> Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or collateral consequence.

---

[28] 559 U.S. 356, 365-66 (2010).

[29] Appellant's Br. 19.

[30] R. at 1040-41

[31] Pros. Ex. 17 at 2.

[32] *Talkington,* 73 M.J. at 216, (citing *Rosato* 32 M.J. at 96 (quoting *Quesinberry*, 31 C.M.R. at 198)).

[33] 559 U.S. at 356.

> The collateral versus direct distinction is this ill suited to eval-
> uating a *Strickland* claim concerning the specific risk of depor-
> tation. We conclude that advice regarding deportation is not
> categorically removed from the ambit of the Sixth Amendment
> right to counsel. *Strickland* applies to Padilla's claim.[34]

The CAAF also later held, in light of *Padilla*, that "in the context of a
guilty plea, sex offender registration consequences can no longer be deemed a
collateral consequence of the guity plea."[35] These holdings make sense in the
context of ensuring that an accused makes a guilty plea knowingly and
voluntarily.

However, the analysis of whether deportation is a collateral matter or is
appropriate for consideration by the sentencing authority is an altogether
different question. That question was not before the Court in *Padilla* or *Riley*.
Indeed, the CAAF specifically declined to extend the holdings of *Padilla* and
*Riley* to the question whether collateral matters should be considered by the
sentencing authority in fashioning an appropriate sentence.[36]

In cases such as *Becker,* involving the impact of whether an accused
would receive retirement benefits, there is a role for the sentencing authority
to play.[37] If the sentencing authority is provided evidence about how close the
accused is to vesting in retirement benefits, how much he or she could stand
to lose, and if the retirement benefits are forfeit as a result of the sentence,
the sentencing authority could decide not to include a punitive discharge as
part of the sentence. Thus, the sentencing authority's decision could poten-
tially have a direct impact on whether or not the accused would lose retire-
ment benefits, depending on the nature of the offense and whether punitive
discharge is mandatory.

Here, there was no action the sentencing authority could take that would
influence the outcome of potential deportation. This case is therefore con-
sistent in this sense with *Talkington,* where the court's rationale was that
"unlike the loss of retirement benefits, which would be a direct consequence
of the imposition of a punitive discharge, there is no causal relation between

---

[34] *Id.* at 366.

[35] *United States v. Riley*, 72 M.J. 115, 121 (C.A.A.F. 2013).

[36] *Talkington*, 73 M.J. at 217.

[37] 46 M.J. 141.

the sentence imposed and the sex offender registration requirement."[38] As Appellant concedes, it is the conviction itself that influences deportation.[39] Even if the sentencing authority gave no punishment at all, it would not change the likelihood Appellant would be deported. As a result, it is by definition a "collateral matter" that would only serve to confuse the sentencing authority about what an appropriate sentence should be because there is no criteria they could use to evaluate what the potential impact of different sentencing options would have, even if it wanted to take account of deportation.

As a result, we hold that the military judge did not abuse his discretion by instructing the members to disregard as a collateral matter that portion of Appellant's unsworn statement relating to deportation.

## C. Admission of Prior Consistent Statement

Appellant asserts the military judge erred in admitting, over Defense objection, Ms. Alpha's prior statements to the SANE as a prior consistent statement. We review a trial judge's decision to admit evidence for abuse of discretion.[40] "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision . . . is outside the range of choices reasonably arising from the applicable facts and the law."[41] We owe less deference to the military judge who fails to articulate a Mil. R. Evid. 403 balancing analysis on the record, and no deference will be afforded to a ruling in which the Mil. R. Evid. 403 analysis is altogether absent.[42]

Prior consistent statements are not hearsay if the declarant testifies and is subject to cross-examination about a prior statement, the prior statement is consistent with the declarant's testimony, and is offered either (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabili-

---

[38] *Talkington* 73 M.J. at 217.

[39] Appellant's Br. 22.

[40] *United States v. Frost,* 79 M.J. 104, 109 (C.A.A.F. 2019).

[41] *Id.* (quoting *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013)).

[42] *United States v. Manns,* 54 M.J. 164, 166 (C.A.A.F. 2000).

tate the declarant's credibility as a witness when attacked on another ground.[43]

The prior consistent statement must also satisfy the strictures of Mil. R. Evid. 403.[44] Thus, for a prior consistent statement to be admissible under Mil. R. Evid. 801(d)(1)(B)(ii), it must satisfy the following: (1) the declarant of the out-of-court statement must testify, (2) the declarant must be subject to cross-examination about the prior statement, (3) the statement must be consistent with the declarant's testimony, (4) the declarant's credibility as a witness must have been "attacked on another ground" other than the ones listed in Mil. R. Evid. 801(d)(1)(B)(i), and (5) the prior consistent statement must actually be relevant to rehabilitate the witness' credibility on the basis on which he or she was attacked.[45] Although the rule does not specify what "another ground" might be, charges of inconsistency or faulty memory are two examples.[46]

In this case, we conclude the military judge did not err in admitting Ms. Alpha's statement to the SANE under Mil. R. Evid. 801(d)(1)(B)(ii). Ms. Alpha, the declarant, testified and was subject to cross-examination. Her prior out-of-court statements to the SANE were consistent with her in-court testimony except in two inconsequential ways. First, she told the SANE that Appellant carried her upstairs, but at trial she testified that she walked upstairs and Appellant followed her.[47] Second, Ms. Alpha did not tell the SANE that Appellant bit her left ear, but did mention this in her testimony.[48] We note, however, that the SANE collected a DNA sample from Ms. Alpha's ear—and testified to that fact—and the DNA expert testified that the swab obtained from Ms. Alpha's ear showed a DNA match at the highest possible indicator for a combination of Ms. Alpha and Appellant. The SANE testified that the swab was taken because of the history given by Ms. Alpha.

---

[43] Mil. R. Evid. 801(d)(1)(B).

[44] *Manual for Courts-Martial, United States*, Analysis of the Military Rules of Evidence app. 22 at A22-61 (2016 ed.).

[45] *United States v. Finch*, 79 M.J. 389, 395-96 (C.A.A.F. 2020).

[46] *Id.* at 395.

[47] R. at 611-12; Pros. Ex. 19.

[48] Pros. Ex. 19; R. at 618.

As to the fourth element of the test in *Finch*, Ms. Alpha's credibility was attacked principally as being inconsistent—one of the grounds specifically given as an example in the Drafter's Analysis of "another ground."[49] Appellant's civilian defense counsel cross-examined Ms. Alpha on the statement she made to NCIS after her initial statement, in which she said she wanted to stop the whole case because the sexual encounter with Appellant was "consensual." The military judge noted in his analysis that the Defense attacked Ms. Alpha on multiple grounds, including the inconsistent statements, that the recantation in her second statement to NCIS was actually the truth and that she lied in court, and that she was subject to potential influences to say it was all consensual because of "family situations and histories relating to other incidents." We find that any of these qualify as "another ground" within the meaning of Mil. R. Evid. 801(d)(1)(B)(ii).

As to the final element of the test, we find that the statement was actually relevant to rehabilitate Ms. Alpha's credibility on the bases on which she was attacked. The statement to the SANE was given shortly after the incident occurred and before the statement she gave to NCIS in which she recanted, and it was consistent with her in-court testimony; therefore, it had a tendency to make more credible her in-court testimony. It tended to show that the statement to NCIS in which she recanted was more likely the product of the realization that Appellant might suffer significant legal consequences as a result of her earlier statement, combined with actual or perceived pressure from Ms. Alpha's family to do what she could to avoid those consequences. This contrasted with Appellant's theory at trial that her second statement to NCIS was the truth.

Additionally, the prior out-of-court statement was made close in time to when the events at issue occurred and were fresh in her mind. Further, it was made when she was less likely to be concerned about the long term consequences of her statements and more concerned with taking appropriate action to document what had happened to her. It was also relevant because it could have assisted the members in deciding between her in-court testimony and her second statement to NCIS that were seemingly at odds. As a result, the statement to the SANE could be viewed on balance to support a determination that Ms. Alpha did not consent to the charged sexual activity.

---

[49] *Finch*, 79 M.J. at 395.

Because the military judge did not put his Mil. R. Evid. 403 analysis on the record, we will perform that balancing test. We find there was high probative value in the statement to the SANE for the purpose of rehabilitation, and that there was nothing inflammatory contained in the statement. Further, we find that it was corroborated by the DNA evidence. We find that there was no danger of unfair prejudice, confusion of the issues, misleading the members, causing undue delay, or wasting time. While it was cumulative in the sense that it was largely a repeat of Ms. Alpha's in-court testimony, it was not needlessly cumulative because its significance was not limited to its repetition of the same facts as her in-court testimony, but also related to its timing and the circumstances under which it was made, all of which rehabilitated Ms. Alpha's credibility as a witness.

## D. Errors in Promulgating Order

The promulgating order erroneously fails to reflect that Specifications 1 and 4 of Charge III were withdrawn and dismissed after arraignment. Also, it fails to reflect that in Charge II, the name of the NCIS special agent to whom the false official statement was made, was altered after arraignment to depict the actual special agent to whom Appellant made the statement. Also, pursuant to a motion under R.C.M. 917, the word "finger" was removed from Specification 2 (later Specification 1) and that the word "vagina" was removed from subparagraph (a) under Specification 3 (later Specification 2).

We test this error under a harmless error standard.[50] Both parties agree these were errors and neither party alleges any prejudice. We agree these scrivener's errors did not materially prejudice Appellant's substantial rights. However, Appellant is entitled to accurate court-martial records.[51] Accordingly, we order the necessary corrective action in our decretal paragraph.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[52]

---

[50] *Crumpley,* 49 M.J. at 539.

[51] *Id.*

[52] UCMJ arts. 59, 66.

As discussed above, we note that the court-martial order does not accurately reflect Appellant's pleas and the wording of the charges and specifications as they appeared when Appellant was arraigned. As noted above, we find no prejudice in these scrivener's errors. Accordingly, we order correction of records in this case to accurately reflect Appellant's pleas.

The findings and sentence are **AFFIRMED**.

Chief Judge MONAHAN and Senior Judge STEPHENS concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court