**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-4948

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DONALD GRIFFIN,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  J. Frederick Motz, District Judge.  (1:08-cr-00033-JFM-1)

Argued:  May 14, 2010            Decided:  August 6, 2010

Before DUNCAN, Circuit Judge, HAMILTON, Senior Circuit Judge, and Arthur L. ALARCÓN, Senior  Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Affirmed by unpublished opinion.  Senior Judge Alarcón wrote the opinion, in which Judge Duncan and Senior Judge Hamilton joined.

**ARGUED:** Steven M. Klepper, KRAMON & GRAHAM, PA, Baltimore, Maryland, for Appellant.  Michael Clayton Hanlon, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** John A. Bourgeois, KRAMON & GRAHAM, PA, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

ALARCÓN, Senior Circuit Judge:

Donald Griffin was convicted of carjacking, possession of a firearm in furtherance of a crime of violence, and possession of a firearm by a previously convicted felon, after a trial by jury. He appeals from the District Court's summary denial of his motion for a new trial in a "marginal order" and his request for an evidentiary hearing in support of his motion.[1]  Griffin argued in his written motion that he was entitled to a new trial because the Government failed to disclose, prior to trial, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  We affirm.  We conclude that the District Court did not abuse its discretion in denying Griffin's request for a new trial and an evidentiary hearing in support thereof because the evidence that was not disclosed prior to trial was not material.

I

A

Before discussing the merits of this appeal, we will summarize the evidence presented to the jury by both sides.  The record shows that on October 31, 2007, Tom M. Brantley left his residence at 6:30 a.m. to go to his workplace.  On that date, two of the vehicles he owned were parked on the street: A black M45 Infiniti

_____

    1 The District Court wrote "Denied" in the margin of the first page of Griffin's motion and signed and dated this entry.

2

passenger automobile and a White ML320 Mercedes-Benz sports utility vehicle.

Mr. Brantley observed a gray Acura Legend parked on the street in a no parking area. Its engine was running. He observed three persons in the car. After he walked past this vehicle, the two passengers got out of the Acura Legend. The person sitting in the driver's seat never got out of the car. They crossed the street and approached Mr. Brantley. One of them pointed an automatic hand- gun at Mr. Brantley and told him not to run. The person holding the gun was taller than his cohort ("the taller male"). Mr. Brantley could not identify the two men at trial because their faces were covered. He also testified that the two men were wearing gloves. The taller male seized Mr. Brantley's key chain and ordered him to sit down. He then hit Mr. Brantley on the back of his head. The two men seized three cell phones, and twenty dollars from Mr. Brantley's clothing.

The shorter male searched the Mercedes-Benz SUV. Nothing was removed.

The taller male asked Mr. Brantley if he had any more money. Mr. Brantley replied that he had $800 in his residence.

The two men then escorted Mr. Brantley to his residence. Mr. Brantley went to a closet and retrieved $800 and handed the money to the taller male. The robbers also took a pair of blue Air Jordan shoes.

The two men escorted Mr. Brantley outside. They ordered him to walk down the street. The shorter male separated the vehicle keys from Mr. Brantley's keychain. The shorter male then entered into Mr. Brantley's M45 Infiniti and drove off. The taller male entered the Mercedes-Benz SUV and drove off. The driver of the Acura Legend get-away car also drove away. Five minutes after the robbery, Mr. Brantley returned to his residence and asked his mother to make a 911 call to report the crime. Mr. Brantley testified on cross-examination that he was not asked by the police whether the men who robbed him were wearing masks or gloves. His written statement to the police does not mention that his assailants wore masks or gloves. Mr. Brantley testified that he was reluctant to testify before the grand jury in this matter. The Government requested a material witness warrant to require him to testify before the grand jury.

B

Detective Courtney Todman, an officer of the Baltimore City Police Department, testified that at approximately 7:00 a.m., on October 31, 2007, he and Officer James L. Howard were requested by a police dispatcher to be on the lookout in the area of the 2800 block of Suffolk Avenue for a white Mercedes truck that had been taken in a carjacking. Officer Todman saw a white Mercedes SUV and three individuals in the street parked at the corner of Suffolk Avenue and Reisterstown Road. Detective Todman also observed an Acura Legend and a black Infiniti. A computer aided dispatch

4

recorded that a 911 telephone call reporting the carjacking was made at 6:58 a.m.

Detective Todman saw Darrick Fraling approach the Mercedes-Benz. Donald Griffin was standing next to the vehicle on the inside of the open driver's side door to the Mercedes-Benz. One of the individuals saw the officers approaching, at which time the suspects started running away. Griffin ran down Suffolk Avenue toward a dead end. Officer Howard pursued Griffin. Detective Todman saw Fraling run toward the back of a red pickup truck and get underneath it. Detective Todman pulled Fraling out from underneath the red pickup truck and arrested him. Fraling was wearing blue Spiderman gloves. After Detective Todman retrieved the gloves, he saw Fraling holding a set of keys. Detective Todman seized the keys and placed them on the street next to the blue gloves. One of the keys had an Acura logo on it. Detective Todman saw a box containing shoes on the passenger seat of the Infiniti. He also saw a handgun on the driver's seat.

Officer Howard escorted Griffin back to where Detective Todman was standing. Griffin was in handcuffs. One of the officers seized $800 and three cell phones from Griffin.

A computer aided dispatch was admitted as Exhibit 21c. It recorded that the arrests of Griffin and Fraling were made at 7:09 a.m., eleven minutes after the police dispatcher received the 911 call from Mr. Brantley's mother.

C

Officer Howard testified that he saw Griffin's feet "hitting the pavement" as he got out of the Mercedes-Benz SUV. He observed a second individual standing in front of the Mercedes-Benz SUV. Officer Howard saw a black object in Griffin's hand. It appeared to match the description of the weapon described in the police dispatch. Officer Howard identified himself as a police officer and ordered the three males not to move. Griffin looked back at Officer Howard and tossed the black object into the Mercedes-Benz. It landed on the front seat. As the black object was tossed, Officer Howard observed that it was a handgun. At the same time, the three males ran off. Officer Howard pursued Griffin and the third male who had been near the black Infiniti. At the end of the block, the third male jumped over a fence and escaped. The male who escaped was shorter than Griffin. Officer Howard pursued Griffin and apprehended him. Griffin was wearing gloves when he was handcuffed. He had a black and silver key in his hands.

Officer Howard identified the gloves that had been introduced into evidence as the gloves worn by Griffin at the time of his arrest. After Officer Howard returned to the Mercedes-Benz, he saw a hand- gun on the front seat. At the police station, Officer Howard saw Detective Todman remove $800 from Griffin's left pants pocket.

6

D

Rosemary Robinson testified that she was an officer with the Baltimore City Police Department. On October 31, 2007, she received a call at 7:03 a.m. that a carjacking had taken place at 4928 Litchfield Avenue. While en route to that address, she received a broadcast that the stolen vehicles had been discovered on Suffolk Avenue. When she arrived at that location, she looked into the white Mercedes-Benz SUV and observed a handgun on the driver's side of the front seat. Officer Robinson unloaded the weapon, took the magazine out, and removed the round that was in the chamber. After doing so, she placed the handgun back on the car seat, but not in the exact same position where she first saw it.

E

Lissette Rivera testified that she worked for the Baltimore City Police Department as a member of the Crime Lab Mobile Unit. Her title was Crime Lab Tech 11. Her duties were to process crime scenes for fingerprints and DNA.

On September 1, 2007, she processed the Mercedes-Benz SUV and the Infiniti stolen from Mr. Brantley in the forensic lab at police headquarters. She swabbed its steering wheel and its arm rests for DNA. She also examined the surfaces of the Mercedes-Benz for fingerprints. She did not recover any latent fingerprints.

7

In searching the Infiniti, she found a box of Air Jordan shoes. She also swabbed it for DNA. She was able to lift a fingerprint from the rear-view mirror of the Infiniti.

F

Camella Nuttroy testified that she was a crime scene technician for the Baltimore City Police Department. On November 1, 2007, she processed the Acura Legend seized on October 31, 2007 on Suffolk Avenue at the Northwest District station garage. In searching the Acura Legend, she found a set of Acura keys inside the vehicle, and a pair of gloves on the front seat. She also processed the vehicle for fingerprints and took DNA swabs. She found 13 latent fingerprints on the exterior and interior of the Acura Legend. She did not look for latent prints in the backseat area.

G

Sean Dorr testified that he was a latent print examiner for the Baltimore City Police Department. His duty was to analyze fingerprint lift cards to determine whether they contained suitable prints. If so, the latent fingerprints are entered into the Automatic Fingerprint Identification System to compare its known prints with the unknown latent prints. The witness found that some of the latent fingerprints matched the known fingerprints of Darrick Fraling. None of the latent prints matched Griffin's known fingerprints.

Christy L. Silbaugh testified that she was a crime lab technician for the Baltimore City Police Department. On October 31, 2007, she responded to a crime scene at 2800 Suffolk Avenue. There she photographed items at the crime scene after consulting with the primary police officer. She photographed the Mercedes-Benz SUV, a black Infiniti, and an unloaded handgun on the front seat of the Mercedes-Benz SUV. She also photographed a black cap, a pair of blue gloves, a black knit cap, and a pair of black gloves. She photographed a single key at 2814 Suffolk Avenue. In addition, she photographed a set of black gloves in front of the Infiniti.

The witness was directed to go to Mr. Brantley's residence at 4928 Litchfield Avenue. She did not attempt to locate latent prints, or swab for DNA, because she had been told by the victim and the primary police officer that the suspects were wearing gloves.

II

A

Griffin testified in his own defense as follows: He admitted on direct examination that he has been twice convicted of possession of drugs with the intent to distribute them. On October 31, 2007, he left his house at 6:30 a.m. During that month he was working at a house near Suffolk Avenue. He took the subway to the

Mondawmin subway station. He then walked up Reistertown Road and turned left on Suffolk Avenue. There he saw three or four men. He also observed a white minivan, a bronze Legend, and a black truck. He recognized Fraling, and two men whose names were Ronnie and Stefan. They were throwing objects out of vehicles, including cell phones. Griffin asked Stefan – "what was going on." Stefan told Griffin he could have the cell phones. Griffin testified he picked up the cell phones and a set of car keys from the street. When he saw the police officers, he ran away. Griffin testified that he always runs from the police. Griffin asserted that he was not wearing gloves when he was apprehended.

Griffin denied participating in the armed robbery of Mr. Brantley, stealing his money, or taking his keys, and any of his vehicles. He also denied picking up a handgun or money. Griffin testified that the money that he had in his pocket when he was searched was part of the proceeds he received from an insurance company as the result of injuries he received in a vehicle accident.

B

Griffin also presented the testimony of three relatives as part of his defense. His mother, Dorothy Lambert, testified that she is a property manager for Westinghouse Real Estate. Her company employed Griffin cleaning out houses and doing home repairs. On October 31, 2007, Griffin telephoned her at around

10

6:00 a.m.  She reminded him that his work site for that day was on Hillsdale Avenue.

Griffin's fourteen year old son testified that his father awakened him at 6:00 a.m. on October 31, 2007.  His father left for work at about 6:30 a.m.

Griffin's brother, Darrin, testified that in October of the year 2007, the two of them were doing home improvement at a house located at 2902 Hillsdale Avenue.  He also stated that his brother left home at 6:45 a.m. on October 31, 2007.

III

The jury returned its guilty verdict on July 18, 2007.  On July 23, 2008, the prosecutor sent a letter to Griffin's trial counsel which reads as follows:

> Dear Mr. Bourgeios:
>
> I am writing to advise you of information which, upon review of my file, may not have been included in discovery or mentioned at trial.  During a July 12, 2008 preparation session with the victim in the above-referenced case, Thomas Brantley, I asked Mr. Brantley whether the perpetrators of the October 31, 2007 carjacking were wearing anything on their hands.  Mr. Brantley's response was that he believed or thought that they were wearing gloves. Mr. Brantley related that he thought it possible that the gunman was wearing weightlifter's gloves, of the type that often do not have fingers.
>
> When shown a photograph of the gloves recovered at the scene, Mr. Brantley stated that the pair of brown/black gloves (which were admitted at trial) looked like the ones the gunman was wearing, but he was not sure

11

about the fingers.  The victim was not certain as to any of these details, with exception that he believed the men were wearing gloves.

Please let me know if you have any questions.

Two days later, Griffin filed a motion for a new trial in which he alleged,

> [t]hat the information belatedly disclosed in Government counsel's letter constituted exculpatory evidence that the Government was required to disclose as Brady material.  "It also constituted Giglio material once Mr. Brantley testified from the stand that the gloves recovered by Officer Howard looked like the ones the gunman was wearing."

Griffin requested an evidentiary hearing on the motion.  The District Court denied the motion on August 7, 2008, without awaiting the Government's response, in a "marginal order".  The District Court did not provide any reasons for denying the motion for a new trial, nor did it set forth any findings of fact or conclusions of law.  Griffin filed a timely notice of appeal on September 12, 2008.  This Court has jurisdiction over the District Court's final judgment pursuant to 28 U.S.C. § 1291.

IV

A

Griffin first argues that we should vacate the District Court's order denying his motion for a new trial based on an alleged Brady violation because it failed to make express findings of fact and law to support its decision.  Ordinarily, this Court

12

reviews the denial of a motion for a new trial for abuse of discretion. United States v. Fletcher, 74 F.3d 49, 54 (4th Cir. 1996); United States v. Cote, 293 F.3d 153, 163 (4th Cir. 2002). "When faced with a claim of prosecutorial misconduct, we review a District Court's factual findings for clear error; if, as here, no findings exist, our review is plenary." United States v. Ellis, 121 F.3d 908, 927 (4th Cir. 1997). Thus, under the law of this Circuit, we are not compelled to vacate a trial court's order because it failed to make factual findings and set forth its legal conclusions. Although it is the better practice for the district court to provide its reasons for denial of a motion for a new trial, under the law of this Circuit, we are not compelled to vacate the court's order because it failed to do so. Instead, we must review the record independently to determine whether the failure to disclose Mr. Brantley's statement concerning the possibility that the gloves worn by his assailant were fingerless was material.[2]

---

2 Griffin's reliance on United States v. Derrick, 163 F.3d 799 (4th Cir. 1998), for the proposition that a trial court must support its conclusions in denying a motion for a new trial orally or in a written opinion is misplaced. In Derrick, the trial court wrote a lengthy opinion explaining its reasons for dismissing the defendants' indictments. Id. at 810. This Court vacated the trial court's order because "the District Court's assertions of intentional misconduct by the Government and its prosecutors are simply unsupported by the records before the Court." Id. at 835. Contrary to Griffin's assertion, this Court did not hold that it is always incumbent for a trial court to set forth its conclusions in dismissing an indictment. (Appellant's Opening Br. 38) Instead, this Court held that if a trial court writes an opinion, it must be based on facts, and not "mere inference and innuendo." Derrick, 163 F.3d at 810.

13

Griffin contends that the failure of the District Court to hold an evidentiary hearing on his motion for a new trial "impedes plenary review". He did not cite any authority to support this contention. A trial court's decision to deny an evidentiary hearing is reviewed for abuse of discretion. United States v. Carson, 560 F.3d 566, 585 (6th Cir. 2009).

The motion was filed July 25, 2008, seven days after the jury returned its verdict on July 18, 2008. The District Court issued its order on August 7, 2008, thirteen days after the motion was filed. The District Court heard the testimony of all the witnesses and observed their demeanor while testifying. It also was aware of the evidence that Griffin was apprehended eleven minutes after the 911 call was made. Griffin had the victim's cell phones, car key, and $800 in his pockets, and he was seen throwing a handgun into the front seat of the Mercedes-Benz SUV.

The District Court also heard Griffin's explanation of how he gained possession of the victim's property. Furthermore, it had Griffin's motion and the prosecutor's letter regarding Mr. Brantley's statement before it when it ruled. Thus, the District Court was in a position to determine whether the undisclosed evidence was material. The District Court did not abuse its discretion in denying Griffin's motion for an evidentiary hearing.

In Brady, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due

14

process "where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[T]he duty to disclose is applicable even though there has been no request by the accused." Strickler v. Greene, 527 U.S. 263, 280 (1999).

> "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

Id. at 281-82. This Court has paraphrased these elements as follows: "[A] Brady violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government either willfully or inadvertently; and (3) the suppression must have been material, *i.e.*, it must have prejudiced the defense at trial." Monroe v. Angelone, 323 F.3d 286, 299 (4th Cir. 2003).

The record shows, and the Government does not dispute, that the undisclosed evidence was favorable to Griffin and relevant because it had a tendency to show that Mr. Brantley "believed or thought it was possible that the gunman was wearing weightlifter's gloves, of the type that often do not have fingers."[3] It is also

---

3 "Relevant Evidence" is defined as follows in Rule 401 of the Federal Rules of Evidence:

> Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

15

undisputed that the undisclosed evidence was known to the prosecutor before trial, but was suppressed until after the jury found Griffin guilty.

What is disputed by the parties is whether the suppressed evidence was material. In Banks v. Dretke, 540 U.S. 668 (2004), the Supreme Court held: "[T]he materiality standard for Brady claims is met when the 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict'." Id. at 698 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)). "In short, [a defendant] must show a 'reasonable probability of a different result'." Id. at 699.

In Giglio v. United States, 405 U.S. 150 (1972), a prosecution witness testified falsely. The prosecutor did not correct the false evidence. Id. at 153. The Supreme Court held in Giglio that "[a] new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury'." Id. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 271 (1959)).

Griffin argues that this Court should apply the Giglio reasonable likelihood standard in determining whether the failure to disclose Mr. Brantley's pre-trial statement to the prosecutor would have affected the judgment of the jury. He argues that his testimony "conveyed a false impression to the jury." (Appellant's Opening Br. 36.)

_____

probable or less probable than it would be without the

16

Mr. Brantley testified at trial that the man who robbed him at gun point wore gloves. He was not asked for a description of the gloves and gave none. His testimony was not false. It is undisputed that Mr. Brantley's assailant wore gloves. Griffin has failed to demonstrate that the prosecutor knew that Mr. Brantley's testimony that his assailant wore gloves was false. Therefore, the Giglio reasonable likelihood standard is inapplicable. For that reason, we must reject Griffin's argument that the burden shifted to the Government to persuade this Court that the failure to disclose Mr. Brantley's pre-trial statement that it was possible that his assailant's gloves were fingerless was harmless beyond a reasonable doubt. In applying the Brady reasonable probability standard, we must determine whether we are persuaded by the totality of the circumstances that the outcome of the trial would have favored Griffin if evidence that Mr. Brantley was uncertain about whether the taller male's gloves were fingerless had been presented to the jury.

We agree with Griffin that evidence that Mr. Brantley was uncertain about the type of gloves worn by his assailant would have been relevant to the question whether Griffin was the person who robbed and assaulted Mr. Brantley.

Griffin's counsel contends that "Fraling, who pled guilty, had fingerprints throughout the Legend, but the other fingerprints recovered from the car were not Griffin's. The unidentified person

evidence.

17

who left those fingerprints likely was the gunman." (Appellant's Opening Br. 22.) This argument ignores Mr. Brantley's uncontroverted testimony that the taller of the two masked males pointed a gun at him and robbed him of the items that were found in Griffin's possession when he was arrested.

As summarized above, Mr. Brantley testified that he was accosted by two masked males, each of whom wore gloves. The taller male pointed a handgun at him and seized his key chain, three cell phones, and twenty dollars. Mr. Brantley also handed the taller male $800 that he had hidden in his closet.

Mr. Brantley saw the taller male drive away in the Mercedes-Benz SUV. The shorter male stole Mr. Brantley's Infiniti.

Eleven minutes after receiving the 911 call, reporting the crimes committed against Mr. Brantley, Griffin was observed getting out of Mr. Brantley's Mercedes-Benz SUV. Another male was seen standing near the black Infiniti. He was shorter than Griffin. Fraling was observed walking toward the Mercedes-Benz SUV. Griffin and the man standing next to the Infiniti ran when Officer Howard ordered the three men not to move. The shorter male escaped. When Officer Howard captured Griffin, he had the key to Mr. Brantley's Mercedes-Benz SUV, three cell phones, and $800 in his left front pocket. He was also wearing gloves.

The evidence that Fraling did not leave the Acura getaway car at the scene of the crimes committed against Mr. Brantley is undisputed. Fraling also did not flee down the street when Officer

18

Howard ordered Griffin, Fraling, and the man standing next to the Infiniti not to move. Instead, Fraling crawled under one of the vehicles where he was subsequently recovered and arrested.

Griffin testified that he did not rob Mr. Brantley of his Mercedes-Benz SUV, his money and his cell phones. Instead, as he walked to work, he happened upon three or four men who appeared to be engaged in looting property from some vehicles. One of these men invited him to steal any of the items that were lying on the street. Griffin testified that he found the key to the Mercedes-Benz SUV and Mr. Brantley's cell phones in the street. He also told the jury that the money he had in his possession when he was arrested did not come from robbing Mr. Brantley. He further testified that he was not wearing gloves when he was arrested.

It has long been established that when a defendant testifies, the trier of fact may consider his or her testimony in determining whether it shows guilt if it finds that the testimony was false.

In Wilson v. United States, 162 U.S. 613 (1896), the Supreme Court instructed as follows:

> "[T]here [cannot] be any question that if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense made or procured to be made as in themselves tending to show guilt."

19

<u>Id.</u> at 620-21.

More recently, in <u>Wright v. West</u>, 505 U.S. 277 (1992), the Supreme Court held that a jury is "entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt." <u>Id.</u> at 296. In <u>United States v. Burgos</u>, 94 F.3d 849 (4th Cir. 1996), this Court stated: "Relating implausible, conflicting tales to the jury can be rationally viewed as further circumstantial evidence indicating guilt." <u>Id.</u> at 867.

In this matter, the jury was aware that Griffin's credibility had been impeached by his admission that he had been convicted of a felony. Furthermore, his implausible explanation of his acquisition of Mr. Brantley's property clearly contributed to the finding of guilt.

Griffin also maintains that the fact that Mr. Brantley was not sure whether the gloves worn by the taller male who robbed him at gunpoint were fingerless "undermined or destroyed Brantley's supposed corroboration of Officer Howard in the credibility contest between Griffin and Officer Howard." (Appellant's Opening Br. 28.) Griffin is apparently referring to Officer Howard's testimony that Griffin was wearing gloves that were not fingerless when he was arrested. Griffin testified that he was not wearing any gloves when he was captured. The jury resolved this conflict in favor of Officer Howard's testimony. The fact that the gloves worn by Griffin when was arrested were not fingerless does not demonstrate that Officer Howard testified falsely. Instead, it demonstrates

that Mr. Brantley's speculation that it was possible that the gloves worn by the taller male were fingerless was erroneous. None of Griffin's remaining contentions demonstrate that the outcome of the trial would have been different if Mr. Brantley's uncertainty about the type of gloves worn by his assailant had been disclosed pretrial.

CONCLUSION

Griffin has failed to demonstrate that there is a reasonable probability that pretrial disclosure of Mr. Brantley's uncertainty about the type of gloves worn by the person who robbed him would have resulted in a finding of not guilty.

Accordingly, we affirm.

AFFIRMED