# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

---

## No. 201600313

---

## UNITED STATES OF AMERICA
Appellee

v.

## KHOI V. PHAM
Senior Chief Culinary Specialist (E-8), U.S. Navy
Appellant

---

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain David M. Harrison, JAGC, USN.
Convening Authority: Commander, U.S. Naval Forces Japan, Yokosuka, Japan.
Staff Judge Advocate's Recommendation: Commander T.D. Stone, JAGC, USN.
For Appellant: Lieutenant Commander Jeremy J. Wall, JAGC, USN; Lieutenant Jacqueline M. Leonard, JAGC, USN.
For Appellee: Major Cory A. Carver, USMC; Captain Sean M. Monks, USMC.

---

Decided 8 March 2018

---

Before MARKS, PRICE, and JONES, *Appellate Military Judges*

---

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

---

PRICE, Judge:

Officer and enlisted members sitting as a general court-martial convicted the appellant, contrary to his pleas, of one specification of false official statement and two specifications of sexual assault, in violation of Articles 107 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907 and

920.[1] The members sentenced the appellant to 179 days' confinement, reduction to pay grade E-3, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

The appellant asserts two assignments of error (AOEs): (1) the evidence is legally and factually insufficient to prove the complaining witness's (PI's) incapacitation beyond a reasonable doubt; and (2) the military judge abused his discretion by denying the appellant's motion to compel production of PI's cell phone which contained potentially exculpatory evidence, thus depriving the appellant of equal access to evidence and violating his due process rights.

Having carefully considered the record of trial and the parties' submissions, we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

On 11 February 2015, PI, a Philippine national civilian living as a foreign resident in Yokosuka, Japan, went out for the evening with two female friends to socialize and with the express intent of getting drunk.

At approximately 1800, PI and her friends went to Yakitori Place where they drank an unspecified quantity of beer and ate some food. PI testified that, "[o]f course we had more than one. . . . so sometimes you order a mug. Sometimes you order a big glass, and we pour like Japanese style. You don't stop drinking while you're pouring it."[2] "[S]ometimes we order like a big bottle . . . and we pour it together with each other . . . . And then when it's finished we gonna pour again."[3]

At around 2100, PI and her friends went to a club and paid a fixed price to participate in an all you can drink for an hour special. They drank oolong-hi, a strong mixed drink consisting of tea and alcohol similar to, but not as strong as, whiskey or rum. PI did not recall how many oolong-hi drinks she

---

[1] The two specifications of sexual assault were for the same sexual act—penile penetration of PI's vulva. Prior to sentencing, the military judge conditionally dismissed—pending final appellate review—Specification 2 of Charge II (sexual assault by causing bodily harm in violation of Article 120(b)(1)(B), UCMJ), as multiplicious with Specification 1 of Charge II (sexual assault upon person incapable of consenting due to impairment by alcohol in violation of 120(b)(3)(A), UCMJ). Record at 983.

[2] Record at 405.

[3] *Id*. at 484.

consumed but testified that she continued to drink while at the club. Her memories were unclear after she left the club, but she did not recall consuming any more alcoholic beverages that night.

Sometime after midnight, PI stopped at a bar she owned named Liquid. NI—her former roommate, current employee, and friend of over ten years—was bartending. PI was so visibly drunk that NI decided not to serve PI any drinks. NI testified that PI could not walk straight, needed to hold on to things to maintain balance, spilled customers' drinks, and could not speak clearly. NI testified that on a scale of one to ten—one being a completely sober person and ten being passed out drunk—PI was an eight, meaning really drunk. PI remained at Liquid for approximately 30 minutes and then left the bar alone and headed for her apartment, which was less than a two minute walk away.

While walking home, PI encountered the appellant on the street. PI and the appellant had been casual acquaintances for approximately ten years but had no prior sexual relationship.

## A. PI's testimony

PI recalled seeing and talking to the appellant on the street near her apartment but could not recall what was said. Her next memory was waking up and seeing him on or near her bed while she looked for a plastic bag to vomit into. She recalled him trying to "touch [her] clothes or maybe taking off [her] clothes" and her saying, "What are you doing here[?] Go home."[4] Her next memory was of the appellant pulling her head towards his exposed penis. She could not recall whether his penis penetrated her mouth or whether she touched his body. PI testified there was no conversation during these events because she was so drunk and did not have the ability to do anything more.

PI's next memory was seeing the appellant kneeling in front of her, with his penis inside her vagina. She testified that she was unable to say anything because she was so drunk, and that she couldn't fight or do anything, including make any decisions. She recalled seeing what appeared to be ejaculate on her stomach. The next morning she contacted friends and asked what to do when you have been raped. PI was subsequently escorted to the hospital for examination.

---

[4] *Id.* 421-23.

**B. Appellant's statements to NCIS**

On 6 March 2015, the appellant was informed by Naval Criminal Investigative Service (NCIS) special agents that he was suspected of rape. His interview with NCIS was video recorded, and he also provided a sworn written statement.[5] The appellant explained that on 11 February 2015 he went out with friends, visited three bars and drank about three beers and three shots of Tequila. He said he "wasn't drunk at all . . . . remember[ed] everything and [he] knew what [he] was doing."[6]

The appellant ran into PI on the street. They hugged, and he agreed to walk PI to her home. He said when they arrived at her apartment, PI led him into her bedroom and told him to lie on the bed. He stated she laid down next to him, they kissed, he removed her shirt, and then she removed her bra and panties. He removed his shirt and sweat pants, but was still wearing shorts and boxer underwear. He said PI told him they needed to hurry before her husband came home,  but then laughed and said she was joking. The appellant said PI's comments scared him, and he thought he should leave.

He claimed PI repeatedly asked him to stay the night. According to the appellant, she wanted him to engage in sexual intercourse with her, despite his protestations and even though she knew he was married. He said PI then pulled his shorts and underwear down and performed fellatio on him while he was standing, then directed him to lie down on the bed and continued to fellate him. He explained that prior to ejaculating, he pushed her onto her back and then ejaculated on her abdominal area. He claimed PI kept asking him to spend the night, but he said he could not stay and then went home.

The appellant denied engaging in sexual intercourse with PI that night or at any other time. He also declared that PI didn't smell like alcohol and that he did not know that she had been drinking.

Additional facts necessary to resolution of the AOEs are included below.

## II. DISCUSSION

**A. Legal and factual sufficiency of the sexual assault**

The appellant argues that the evidence is both legally and factually insufficient to find that PI was incapable of consenting to sexual activity due to impairment by alcohol or, alternatively, that the evidence is factually insufficient to overcome his reasonable mistake of fact. We disagree.

---

[5] Prosecution Exhibit (PE) 1, 3.

[6] PE 3.

We review for both legal and factual sufficiency *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)); *see also* Art. 66(c), UCMJ. When reviewing for legal sufficiency, we ask whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Id*. at 325.

A conviction for sexual assault upon PI, a person incapable of consenting due to impairment by alcohol, required proof beyond a reasonable doubt of two elements: (1) that the appellant committed a sexual act upon PI—by penetrating her vulva with his penis, and (2) that PI was incapable of consenting to the sexual act due to impairment by alcohol and her condition reasonably should have been known by the appellant. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶45a(b)(3)(A).[7]

*1. Evidence of the sexual act*

The evidence that the appellant penetrated PI's vulva with his penis is overwhelming. PI's testimony that she saw the appellant's penis inside her vagina was credible and  corroborated by forensic evidence. His semen DNA profile, including spermatozoa, was found on swabs taken from her vagina and cervix during a sexual assault forensic examination (SAFE). The SAFE examiner also observed micro-abrasions near PI's vaginal opening consistent with blunt force trauma, which can be caused by penile penetration.

We are unpersuaded by the appellant's assertions that the DNA collection procedures and defective equipment used to dry the swabs could have mixed the DNA evidence collected from PI's abdomen and pubic mound with evidence collected from her vagina and cervix. Notably, the only specimens that contained the appellant's semen DNA profile and spermatozoa were those obtained from her vagina and cervix. This forensic evidence effectively rebutted the appellant's cross-contamination theory as swabs taken from PI's pubic mound included the appellant's semen DNA profile, but no spermatozoa, while no semen DNA was detected on swabs taken from her abdomen. In addition, both the SAFE examiner and observer testified they

---

[7] Charge Sheet; Record at 898; AE CLIII at 1.

did not see swabs placed in the drying rack touch other swabs. The observer testified that she watched the swabs the entire time they were in the dryer.

Juxtaposed against this evidence of penetration are the appellant's denials of engaging in vaginal intercourse with PI. After being advised that he was suspected of rape by NCIS investigators, he told a remarkable story of seduction after a chance encounter on the street with PI, a non-romantic acquaintance. He claimed that after she repeatedly asked him to spend the night and engage in sexual intercourse, he demurred. At which time she pulled his underwear down and fellated him until he ejaculated. The appellant denied engaging in vaginal sexual intercourse with PI at least six times during the NCIS interview. We find his denials and story of a consensual sexual encounter with PI both incredible and evidence of his consciousness of guilt. *See United States v. Colcol*, 16 M.J. 479, 484 (C.M.A. 1983) ("false statements by an accused in explaining an alleged offense may themselves tend to show guilt") (citation omitted).

We are convinced beyond a reasonable doubt the appellant committed the charged sexual act.

### 2. *Evidence of incapacity*

We also find PI was incapable of consenting to the sexual act due to impairment by alcohol, that the appellant reasonably should have known her condition, and that there was no reasonable mistake of fact as to PI's capacity to consent.

First, PI consumed a significant quantity of alcohol over a period of at least four hours with the express goal of getting drunk. Although she did not recall the specific quantity of beer or number of mixed drinks that she consumed, her testimony was consistent, credible, and corroborated in part.

PI testified that she consumed beer over a three-hour period at Yakitori Place, where she and her friends drank beer together, poured beer from bottles into their own mugs, and refilled their mugs and those of their friends whenever empty. She also consumed an unspecified number of mixed drinks. Her testimony conveys that she continuously drank oolong-hi, an alcoholic beverage, for approximately one hour. This interpretation is supported by her history of heavy drinking, her specific intent to get drunk that night, her payment of a fixed fee to participate in a one hour all you can drink special, her loss of memory, and severe intoxication at Liquid later in the evening.

NI's testimony corroborated that PI was heavily intoxicated. PI could not walk straight, spilled drinks, slurred her speech, and was so drunk NI declined to serve her alcoholic beverages that evening. PI's limited memory after leaving the second club further corroborates her degree of intoxication.

Second, PI's limited memories and inability  to resist, say anything, or do anything while the appellant penetrated her vagina with his penis are evidence she "lack[ed] the cognitive ability to appreciate the sexual conduct in question or [lacked] the physical or mental ability to make [or] to communicate a decision about whether [she] agreed to the conduct." *United States v. Pease*, 75 M.J. 180, 185-86 (C.A.A.F. 2016) (citation and internal quotation marks omitted).

Her limited recollections, limited ability to process information, and inability to communicate and to physically resist the appellant's penetration of her vulva evidence severe alcohol impairment. Her memory of seeing the appellant in her apartment when she awoke with the urge to vomit and subsequent recollection of the appellant pulling her head toward his exposed penis are consistent with fragmentary blackouts that often accompany severe intoxication. Her testimony that she could not talk, say anything, fight, or do anything because she was so drunk support a finding that she lacked the physical and mental ability to communicate consent or lack thereof.

Third, we are convinced that the appellant reasonably should have known that PI was incapable of consenting to the sexual act due to impairment by alcohol and conclude the evidence overcomes his asserted mistake of fact as to her incapacity. The appellant encountered PI on the street within moments of her departure from Liquid where NI had observed multiple physical and mental manifestations of her severe state of alcohol impairment. NI's description of PI's severe impairment is credible, direct evidence that the appellant reasonably should have known that PI was heavily intoxicated and incapable of consenting to sexual conduct.

Moreover, the appellant's claims that he did not know PI had been drinking and that they engaged in normal conversation both on the street and during a lengthy and fanciful sexual encounter are incredible. Like his repeated and false claims that he did not engage in vaginal intercourse with PI, the appellant's false statements about her level of impairment also tend to show his guilt and leave us convinced that there was no reasonable mistake of fact. *See Colcol*, 16 M.J. at 484.

In conclusion, we find PI's testimony to be credible, consistent even through the crucible of extensive cross-examination, and corroborated by other evidence. Her recollections of the sexual act, though fractured, convey her clear memory of penetration and incapacity to consent due to severe alcohol impairment. Additionally, evidence of the appellant's consciousness of

guilt weighs heavily in our determination. Like the court-martial members, we are convinced that his statements to NCIS were false.[8]

Proof beyond a reasonable doubt is a high standard but "does not mean that the evidence must be free from conflict." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007) (citation omitted). On the basis of the record before us, and considering the evidence in the light most favorable to the government, a reasonable fact finder could have found all the essential elements of the charged offense beyond a reasonable doubt. *Turner*, 25 M.J. at 324. After weighing all the evidence and recognizing that we did not see or hear the witnesses, we are also convinced that the appellant is guilty beyond a reasonable doubt.[9]

## B. Motion to compel production of cell phone

### 1. Facts

On 18 February 2015, PI voluntarily provided her cell phone, a Samsung Galaxy S-IV, to NCIS for forensic examination. NCIS investigators performed a *logical extraction* of the phone and returned it to PI the same day. In response to a January 2016 defense discovery request for a copy of the *physical extraction* of PI's cellular phone, the government provided a report and disc produced from the *logical extraction* performed 11 months earlier. A mobile device *logical extraction* utilizing the forensic tools employed by NCIS apparently provided contacts, call logs, media, SMS, and application data, while a *physical extraction* would have provided access to a broader scope of data including additional file data, hidden files, and deleted data.[10]

In March 2016, a defense expert consultant determined the government had provided data only from a *logical extraction*. The appellant then filed a motion to compel production of PI's "Samsung Galaxy S-IV" cell phone. The defense asserted that the report derived from the *logical extraction* did not include deleted data, hidden data, or mobile applications data. The defense

---

[8] The military judge properly instructed the members that "If an accused voluntarily offers an explanation or makes some statement tending to establish hisinnocence and such explanation or statement is later shown to bew false, you may consider whether this circumstantial evidence point to a consciousness of guilt." Record at 909. *See Colcol*, 16 M.J. at 484 (C.M.A. 1983).

[9] Though not raised as an AOE, we are also convinced beyond a reasonable doubt that the appellant is guilty of sexual assault by causing bodily harm in violation of Article 120(b)(1)(B), UCMJ. Charge II, Specification 2; Court-Martial Order.

[10] AE XL at Enclosure (D).

also sought data relevant to PI's claimed initial reports of rape or other messages she may have sent which were potentially probative of her capacity to consent. The evidence submitted for consideration by the court consisted of documents attached to the parties' pleadings.

After hearing argument, the military judge denied the defense motion to compel production of PI's cell phone. The appellant asserts that the military judge abused his discretion, depriving the appellant of equal access to evidence, as required by Article 46, UCMJ, and in violation of his due process rights. We disagree.

### 2. Law

The parties to a court-martial are entitled to an "equal opportunity to obtain witnesses and other evidence[.]" Article 46, UCMJ, 10 U.S.C. § 846 (2012). "Each party is entitled to production of evidence that is relevant and necessary." RULE FOR COURTS-MARTIAL, (R.C.M.) 703(f)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). "[A] party is not entitled to production of evidence which is destroyed, lost, or otherwise not subject of compulsory service. However, if such evidence is . . . essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant [appropriate relief or abate the proceedings]." R.C.M. 703(f)(2). The burden of persuasion on a motion for appropriate relief is on the moving party. R.C.M. 905(c)(2)(A), 906(b)(7).

We review a military judge's discovery rulings, including remedies, for an abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015). "The abuse of discretion standard calls for more than a mere difference of opinion." *Id.* (citations omitted) (internal quotation marks omitted). "[A]n abuse of discretion occurs when [the military judge's] findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *Id.* (citation and internal quotation marks omitted).

### 3. Analysis

We conclude that the military judge's findings of fact are not clearly erroneous and adopt them as our own. We also conclude that the military judge did not abuse his discretion in denying the defense motion to compel production of PI's cell phone and by not abating the proceedings.

First, the military judge's finding that NCIS was not capable of conducting a physical extraction and securing the deleted data from PI's cell phone was supported by the record. Although the defense submitted an email from a defense expert consultant asserting that physical extraction of a "Galaxy S-IV" could be performed, we find the NCIS expert's response to that

email both more credible and unrebutted.[11] The NCIS expert explained that he could not perform a physical extraction because a "Galaxy S-IV" was not a "rooted" phone.[12] The evidence provided in support of the defense expert conclusion that a physical extraction could be performed was a "screenshot," of an apparently earlier version of the phone, a "Galaxy SIII, Alfa," and the screenshot indicated it was a "rooted" phone.[13] Based upon this limited and contradictory evidence, we agree with the military judge that the appellant failed to sustain his burden of persuasion. Furthermore, there was no evidence submitted at trial or to date that in February 2015, when NCIS had control of PI's cell phone, the technology existed to conduct a physical extraction of a Galaxy S-IV cell phone.[14]

Second, PI's cell phone was unavailable as defined in R.C.M. 703(f)(2) when the appellant submitted his discovery request.

In January 2016 when the defense requested PI's cell phone in discovery, the cell phone was "destroyed, lost, or otherwise not subject to compulsory process." R.C.M. 703(f)(2). It is undisputed that PI's cell phone was not then in the possession, custody, or control of the United States, having been returned to her approximately 11 months earlier. It is also not in dispute that PI was a non-U.S. citizen, legal permanent resident of Japan and as such "not subject to subpoena" under the Rules for Courts-Martial. *See* R.C.M. 703(e)(2)(A), Discussion.

However, the availability of a process to compel production of PI's cell phone under the Status of Forces Agreement (SOFA) between the United States and Japan was and remains in controversy. At trial, the defense asserted the SOFA provided a mechanism for compulsory process of PI's cell phone. The military judge found the evidence submitted by the defense—an

---

[11] AE XL at Enclosure (M), AE LVIII at Enclosure (3).

[12] The NCIS expert explained "rooting" provides the ability to alter or replace system applications and settings, run specialized applications that require administrator-level permissions, or perform other operations that are otherwise inaccessible to a normal Android user. Rooting can also facilitate the complete removal and replacement of an Android device's operating system. AE LVIII at Enclosure (3).

[13] AE XL at Enclosure (M).

[14] There is evidence that as early as December 2015, the forensic software supported a "file system extraction" of the Galaxy S-IV including data from the "Line" application. AE LVIII at Enclosures (3)-(4). However, there is no evidence a "file system extraction" would include deleted data sought by the defense. AE XL at Enclosures (D), (H); AE LVIII at Enclosure (3).

email citing SOFA Articles 15-18 but not including attachments which he presumed to be the applicable SOFA provisions—insufficient to sustain their burden of persuasion.[15]

After reviewing the SOFA provisions cited by the defense at trial and now attached to the record on appeal by motion before this court, we, like the military judge, are unable to conclude that those provisions provide for "compulsory process" of PI's cell phone.[16] Article 17, the provision cited at trial most relevant to production of PI's cell phone does not appear to be compulsory or even relevant here.[17] Article 17 entitled "Presentation of documents or evidence" states Japanese authorities "may" when requested by appropriate U.S. authority "permit" access to evidence "in their custody[.]"[18] The plain language of this provision appears discretionary and applicable when the requested "documents or evidence" are in the "custody" of Japanese authorities; there is no evidence that PI's cell phone was in the possession or custody of Japanese authorities at any time.

Additionally, there is evidence that prior to trial counsel's 23 March 2016 request that PI provide the Galaxy S-IV for additional forensic examination, she had obtained a new cell phone and "declined to provide her phone" for further analysis.[19] In May 2016, PI testified that she had a "new phone" by

---

[15] In its motion at trial, the Defense cited Articles 15-18 of the SOFA, as well as an email from the office of the staff judge advocate to the Commander of Fleet Activities in Yokosuka containing the titles of those Articles. AE XL at FN3 and Enclosure (K).

[16] We assume without deciding the undated document attached to the record entitled "Laws for Special Measures Concerning Criminal Cases, Under Authorization of the Ministry of Justice, EHS Law Bulletin Series, EHS Vol. II" was part of the SOFA in accordance with the 28 March 2016 email from the "Legal Advisor, Office of the Staff Judge Advocate, COMFLEACT Yokosuka, Japan, International Law Director, Region Legal Service Office, Japan" also attached to the record. Appellant's Motion to Attach As Appendix to Appellant's Brief [hereinafter Motion to Attach Documents] of 16 February 2017 granted 24 February 2017.

[17] Article 15 (Appearance and other duties of witness), Article 16 (Cooperation for production of witnesses), and Article 18 (Cooperation in criminal cases other than those involving offenses against laws or ordinances of Japan) do not appear relevant to production of evidence. Motion to Attach Documents.

[18] *Id.*

[19] In emails dated 23 March 2016, Trial counsel contacted PI's Victim's Legal Counsel (VLC) to request that PI surrender her cell phone for additional forensic testing. The VLC asked whether they were requesting PI's "old phone or her new phone." When trial counsel clarified it was her "old phone" the VLC responded with a "?" AE LVIII at Enclosure (4); AE XL at Enclosure (N).

the time she was asked to provide her phone for additional examination and that "all [her] messages [we]re gone."[20]

Third, we agree with the military judge that the evidence does not satisfy the requirements for production of relevant and material evidence under R.C.M. 703 or exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

Even, assuming *arguendo*, the technology existed to conduct a physical extraction of PI's cell phone when NCIS possessed it, the appellant presented no evidence or persuasive argument that such evidence "possess[ed] an exculpatory value that w[ould have been] apparent before the evidence was destroyed," or in this case "returned" to PI. *See United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Further, even assuming the evidence was "potentially useful," there is no evidence the government's actions in not preserving the cell phone were in "bad faith" and thus in violation of due process. *Simmermacher*, 74 M.J. at 199 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Fourth, the information derived from logical extraction of PI's cell phone and provided to the appellant satisfied the Article 46, UCMJ, requirement for "equal access to evidence." *United States v. Roberts*, 59 M.J. 323, 325, (C.A.A.F. 2004). Stated another way, the appellant and government enjoyed equal access to the same evidence derived from the logical extraction of PI's cell phone, a lengthy report and an eight gigabyte disk of data.

Accordingly, the military judge's decisions to deny the motion to compel production of PI's cell phone and not to abate the proceedings were not "influenced by an erroneous view of the law," and were well within "the range of choices reasonably arising from the applicable facts and the law." *Stellatto*, 74 M.J at 480 (citation and internal quotation marks omitted).

### III. CONCLUSION

The findings and sentence, as approved by the CA, are affirmed.

Senior Judge MARKS and Judge JONES concur.

For the Court

R.H. TROIDL
Clerk of Court



---

[20] Record at 571-72.